John E. MOORE, Jr., and Clifton J. Durant, Appellants,

v.

UNITED STATES, Appellee.

Nos. 00–CF–1016, 00–CF–1111.

District of Columbia Court of Appeals.

Argued Sept. 22, 2005.
Decided June 21, 2007.

---

Robert S. Becker, with whom Douglas Wham was on the brief, Washington, District of Columbia, for appellant Moore.

Jennifer A. Renton, for appellant Durant.

Alessio D. Evangelista, with whom Roscoe C. Howard, Jr., then United States Attorney, John R. Fisher, then Assistant United States Attorney, Elizabeth Trosman, Julius Rothstein, and Alexandra F. Foster, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ and GLICKMAN, Associate Judges, and SCHWELB, Senior Judge.[*]

GLICKMAN, Associate Judge.

Appellants John Moore and Clifton Durant seek reversal of their convictions for narcotics and weapons offenses. They raise a variety of challenges, some of which have limited merit, but none of which entitles either of them to the requested relief. We affirm the judgments of conviction.

I.

Durant, his wife Christina Durant, and Moore were charged in a seven-count indictment with the crimes of maintaining a crack house, possession of a prohibited weapon (a semi-automatic Beretta handgun), and other weapons-related offenses.[1] The indictment also charged each of the Durants (but not Moore) with unlawful possession with intent to distribute a controlled substance (cocaine) and possession of a firearm during a crime of violence or dangerous offense.

According to the government's evidence at trial, on the afternoon of December 22, 1997, officers and detectives of the Metropolitan Police Department's Major Narcotics Branch executed a search warrant at 1520 Holbrook Street, Apartment 204, in

[*] At the time of argument, Judge Schwelb was an Associate Judge. His status changed to Senior Judge on June 24, 2006.

1. The other weapons-related offenses were carrying a pistol without a license ("CPWL"), possession of an unregistered firearm, and unlawful possession of ammunition. The CPWL count later was dismissed as to all three defendants on government motion.

northeast Washington, D.C.[2] Upon entering the small, one-bedroom unit, the police found Christina Durant sitting in the living room. She was alone in the apartment, but the police observed an item or two of men's clothing in the bathroom in addition to the many items of women's apparel hanging in the bedroom.

On top of an entertainment center in the bedroom, the police found and seized a loaded 9 mm semi-automatic Beretta handgun; 91 ziploc bags of cocaine; $405 in cash; a quantity of recently dated mail correspondence individually addressed to Mrs. Durant and each of appellants (at addresses other than the Holbrook Street apartment), along with other personal papers in each of their names;[3] and photographs of appellants and Mrs. Durant. One of the photographs showed Moore standing in the bedroom of Apartment 204, holding what appeared to be the same 9 mm Beretta handgun as was found on the entertainment center. Two other photographs of Moore depicted him standing in the bedroom or at the front door of the apartment. Another photograph showed appellant Durant and his wife together by the apartment door. The police also seized Mrs. Durant's purse, which contained $200 in cash, personal papers and other items.

While the search was under way, Durant and Moore were observed on Holbrook Street in Durant's car, a Chevy Blazer. The police stopped the vehicle. Durant, who was driving, produced his license and, being asked, stated that he lived at 1520 Holbrook Street, Apartment 204. Durant and Moore then were arrested. In a sub-sequent search of the Blazer, the police retrieved Durant's keys, one of which was to the door of Apartment 204.

Mrs. Durant was the only defendant who took the stand at trial. She testified that she was the lessee of Apartment 204. She had lived there with her young son until October 1997, when she married Clifton Durant and began to reside with him at another address. After she moved out, Mrs. Durant stated, she continued to pay the rent and utility bills for the Holbrook Street apartment. She also continued to visit and utilize the unit, she explained, because its location was convenient to her son's school. Mrs. Durant testified that both her husband and Moore had keys to Apartment 204, and that she had allowed Moore to stay at the apartment. She described Moore as her husband's friend and employee. When the police arrived at the apartment on December 22, 1997, Mrs. Durant testified, she was in the living room watching television and preparing to go watch her son in a school play. Claiming that she had given her brother-in-law permission to occupy the apartment in her absence,[4] Mrs. Durant professed to have no knowledge of the gun and drugs found in the bedroom even though she had kept her clothing and other possessions there.

Following Mrs. Durant's testimony, each appellant put on a witness to establish that he did not reside at 1520 Holbrook Street. A rental company employee produced records showing that Clifton Durant had signed a lease in October 1996 for an apartment located at 1909 M Street, Northeast, for which he had paid rent

---

**2.** The warrant was based on information, of which the jury was not informed, that appellant Clifton Durant had been selling drugs from the apartment.

**3.** Appellants' personal papers also were found elsewhere in the bedroom.

**4.** The brother-in-law was not called as a witness. It does not appear that the police found anything linked to him when they searched the apartment.

through the date of trial. A second witness who knew Moore as a friend testified that Moore had lived at 1909 M Street until October 1997, and in Northern Virginia from then through January 1998.

After the case was submitted to the jury, for reasons that we shall discuss below, the trial court granted Mrs. Durant's motion for a mistrial. Soon thereafter, the jury found each appellant guilty on all counts.

## II.

The claims that appellants raise on appeal may be grouped as follows. First, both Moore and Durant argue that there was insufficient evidence to sustain some or all of their convictions. Second, Durant argues that the court erred in denying his pretrial motions for severance and the suppression of evidence. Third, Moore argues that the trial court's instructions regarding possession of a prohibited weapon were deficient. Fourth, both Moore and Durant argue that the court erred in denying their motions for a mistrial based on the jury's exposure to prejudicial evidence not introduced at trial. We address the four categories of claim, in that order.

### A. Sufficiency of the Evidence

 In an appeal from a criminal conviction, we evaluate the sufficiency of the evidence "in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact. . . ." *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987). We "must deem the proof of guilt sufficient if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Rivas v. United States,* 783 A.2d 125, 134 (D.C.2001) (en banc) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)) (emphasis in the original). Only when there is "no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt" may we reverse a conviction for evidentiary insufficiency. *Frendak v. United States,* 408 A.2d 364, 371 (D.C.1979).

 In general, a sufficiency challenge is to be evaluated in light of all the evidence adduced at trial, including any inculpatory evidence presented in the defense case, even if the government's evidence by itself would have been insufficient to sustain the conviction. An accused who elects to present evidence runs the risk of filling gaps in the prosecution case. *See Franey v. United States,* 382 A.2d 1019, 1021–22 (D.C. 1978); *In re A.B.H.,* 343 A.2d 573, 575 (D.C.1975). Thus, it is commonly said, "a defendant who introduces evidence after the denial of his motion for a judgment of acquittal made at the close of the government's case thereby waives that motion and cannot make the ruling the subject of appellate review." *Franey,* 382 A.2d at 1021.[5] In assessing whether there was sufficient evidence of appellants' guilt in the present case, therefore, we consider all the evidence admitted at trial, notably including Christina Durant's testimony as well as

5. The "waiver" terminology may be misleading. "[T]he so-called 'waiver' is not a 'genuine' waiver; 'it is a conventional fiction used to describe and produce the result that the courts will not blind themselves to incriminating evidence introduced by the defendant who chooses to respond, rather than to demur, to the government's case.' " *Wright v. United States,* 513 A.2d 804, 809 (D.C.1986) (quoting *United States v. Foster,* 251 U.S.App. D.C. 267, 269, 783 F.2d 1082, 1084 (1986) (en banc)).

that of appellants themselves.[6]

### 1. Constructive Possession

Durant contends that there was insufficient evidence to prove that he constructively possessed the drugs and gun found in the bedroom of Apartment 204. The contention does not persuade us.

To prove constructive possession of drugs, weapons, or other contraband, the evidence must show that the accused knew of its presence and had both the ability and intent to exercise dominion and control over it. *Rivas*, 783 A.2d at 129. "Constructive possession may be sole or joint and may be proven by direct or circumstantial evidence." *Id.* Where knowledge and ability to exert control over contraband are shown, "the additional evidence necessary to prove constructive possession is comparatively minimal." *Id.* at 137. A wide variety of additional probative evidence may suffice. In particular, we have recognized that a *prima facie* case of constructive possession may be established by evidence linking the accused to "an ongoing criminal operation of which the possession is a part." *Earle v. United States*, 612 A.2d 1258, 1265–66 (D.C.1992). Evidence showing the accused's control or occupancy of the premises in which the contraband is found may also serve to prove constructive possession. *Rivas*, 783 A.2d at 137; *see also Taylor v. United States*, 662 A.2d 1368, 1373 (D.C.1995) ("It is usually easy to establish that the owner of a car or the occupant of a living area has constructive possession of illicit items recovered from these places."). In general, "a jury is entitled to infer that a person exercises constructive possession over items found in his home." *United States v. Dykes*, 365 U.S.App. D.C. 381, 385, 406 F.3d 717, 721 (2005) (internal quotation marks and citations omitted). "Evidence suggesting that a defendant has regular access to the premises, such as possession of a key, may also be sufficient to establish constructive possession." *United States v. Dingle*, 324 U.S.App. D.C. 453, 457, 114 F.3d 307, 311 (1997). The "inference that a person who occupies an apartment has dominion and control over its contents applies even when that person shares the premises with others, although it is plainly not as strong an inference in that circumstance." *Dykes, supra* (internal quotation marks and citations omitted).

Applying these principles, we find sufficient evidence that Durant constructively possessed the contraband found in Apartment 204. Although Durant was not present inside the apartment when the contraband was discovered, he was in the immediate vicinity. He had a key to the apartment; he admitted living there; he had been photographed there; and his wife was the lessee. The 91 ziplocs of crack cocaine and the semi-automatic

---

**6.** An exception to the "waiver" rule originating in *Cephus v. United States*, 117 U.S.App. D.C. 15, 324 F.2d 893 (1963), provides that if a defendant introduced evidence solely to counteract damaging evidence presented by a co-defendant, then the defendant's sufficiency challenge will be evaluated by reference to the government's evidence alone, without regard to any inculpatory evidence presented by the co-defendant or the defendant himself. *See id.*, 117 U.S.App.D.C. at 19–20, 324 F.2d at 897–98; *Guishard v. United States*, 669 A.2d 1306, 1312 (D.C.1995); *Dumas v. United States*, 483 A.2d 301, 304 (D.C.1984). Unlike the Circuit Court, *see United States v. Lawrence*, 374 U.S.App.D.C. 12, 17–18, 471 F.3d 135, 140–41 (2006), we have held that "the *Cephus* exception is limited to cases in which one defendant's evidence is 'introduced in response to' damaging testimony presented by a co-defendant." *Guishard*, 669 A.2d at 1312. Appellants in the case at bar have not claimed that their defense presentations were in response to co-defendant evidence, nor has either appellant invoked the *Cephus* exception.

handgun recovered from the apartment were found in the unit's only bedroom, lying in plain view next to Durant's personal papers. Taken together, these facts allowed a jury to infer beyond a reasonable doubt that Durant knew the drugs and gun were in his apartment, and that he had the ability and intent to exercise dominion and control over them.

It is of little moment that much the same evidence showed constructive possession by Moore and Christina Durant. Possession can be joint. In some cases involving the presence of more than one person on the premises or even shared occupancy and control, common possession of contraband is not indicated, and the evidence does not justify attributing the illegal items to one party rather than another beyond a reasonable doubt. *See, e.g., In re R.G.*, 917 A.2d 643, 649–650 (D.C.2007); *In re T.M.*, 577 A.2d 1149, 1152 (D.C.1990). In this case, however, the evidence showed a close personal and business relationship among the three defendants, and the quantity and packaging of the cocaine indicated a criminal sales enterprise involving multiple participants rather than possession of a small amount of drugs or a gun by a single individual for purely personal use. The evidence of "a concert of illegal action" involving the contraband reinforced the inference of joint possession by Durant and his co-defendants. *Wheeler v. United States*, 494 A.2d 170, 173 (D.C.1985).

**7.** Recodified as D.C.Code § 48–904.02(a)(5) (2001). The purview of the statute is not restricted to crack cocaine establishments.

**8.** In its entirety, § 33–542(a)(5) makes it a crime for any person "[k]nowingly to keep or maintain any store, shop, warehouse, dwelling, building, vehicle, boat, aircraft, or other structure or place, which is resorted to by persons using controlled substances in violation of this chapter ['Controlled Substances'] for the purpose of using these substances or which is used for keeping or selling them in violation of this chapter."

## 2. Maintaining a Crack House

Appellants were convicted of "maintaining a crack house," as the offense colloquially is known, in violation of (former) D.C.Code § 33–542(a)(5).[7] In pertinent part, the statute makes it unlawful for any person "[k]nowingly to keep or maintain any ... dwelling, ... or other structure or place, ... which is used for keeping or selling [controlled substances] in violation of this chapter."[8] Appellants argue that there was insufficient evidence to show that the Holbrook Street apartment was a "place of common resort" for keeping or selling drugs. Additionally, Moore argues that the evidence did not establish that he "controlled or managed" the premises, and Durant asserts (more broadly) that no evidence showed that he "knew or intended" that the apartment would be used as a crack house.

■ As to appellants' first contention, the trial court used the term "common resort" in its instructions, without objection from either side, in explaining that "a single act of keeping or selling crack cocaine in a certain place, even by the person who maintains that place, is not enough to make the place a crack house." "Rather," the court stated, "the dwelling or structure or place must be a common resort for the purpose of selling or keeping crack cocaine."[9] However, by thus incorporating

**9.** It appears that the court borrowed the term "common resort," which it did not define, from the pattern jury instruction for the offense of keeping a bawdy or disorderly house in violation of D.C.Code § 22–2722 (2001). That instruction states, *inter alia*, that "the premises must be a common resort for the purpose of" prostitution, unlawful sexual activity, or gambling. CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.95 (4th ed.1993). As far as D.C.Code § 33–542(a)(5) is concerned, the "common resort" requirement appears more relevant to the prong of

the reference to a "common resort," the court gave an instruction that was more favorable to the appellants than it needed to be. While "common resort" evidence would be probative, it is not necessary; § 33–542(a)(5) requires proof only that the defendant kept or maintained the premises in question knowing that those premises were being "used for keeping or selling" controlled substances. The premises need not be a "common resort" for that purpose.

Although D.C.Code § 33–542(a)(5) had a statutory precursor with parallel if not identical language in former D.C.Code § 33–416 (1973),[10] the law under which appellants were prosecuted was enacted as part of D.C. Law 4–29, the Uniform Controlled Substances Act of 1981 (the "DC–CSA"). We have recognized that the DC–CSA was intended to bring the law of the District of Columbia "in conformity with" the Federal Controlled Substances Act ("US–CSA"), 21 U.S.C. §§ 801 *et seq. See Thomas v. United States,* 650 A.2d 183, 195 (D.C.1994). The counterpart of D.C.Code § 33–542(a)(5) in the US–CSA is 21 U.S.C. § 856, commonly known as the Crack House Act. Section 856 was added to the US–CSA in 1986 and substantially amended in 2003.[11] While its language is not identical to that of our local statute, from its inception the federal Crack House Act has made it unlawful to, among other things, "knowingly ... maintain any place ... for the purpose of manufacturing, distributing, or using any controlled substance." 21 U.S.C. § 856(a)(1). Even though § 856 was enacted after § 33–

542(a)(5), we think it appropriate, given the similarity in language, to look for guidance in construing our law to federal case law interpreting the federal statute.

The present appeals raise two questions regarding the interpretation of D.C.Code § 33–542(a)(5). First, what does it mean to "keep or maintain" a place for illegal drug activity? Second, what kind or level of illicit activity is encompassed by the statutory requirement that the premises in question knowingly be "used for" keeping or selling controlled substances?

 As to the first question, D.C.Code § 33–542(a)(5) is not directed at casual visitors, and "keeping and maintaining" means more than merely residing in the subject premises. Moreover, engaging in the specified illegal activity at the premises-selling drugs there, for example—is not the same thing as keeping or maintaining the premises for such activity. *United States v. Clavis,* 956 F.2d 1079, 1091 (11th Cir.1992). In our case, the trial court instructed the jury, *inter alia,* that

> a person may be found to have maintained a place as a crack house, if he or she controlled or managed the dwelling or place. The government need not prove that the defendant owned or had legal control over the dwelling or the place.

\* \* \*

 It is not necessary that the defendant be shown to have himself or

---

the statute under which appellants were not charged. *See* footnote 8, *supra.* Even as to that prong, however, the phrasing may not be apt, inasmuch as a less-than-common resort for the proscribed purpose would seem to suffice to prove a violation.

**10.** Former D.C.Code § 33–416 declared that any place "resorted to by narcotic drug addicts for the purpose of using narcotic drugs

or which is used for the illegal keeping or selling of the same, shall be deemed a common nuisance. No person shall keep or maintain such a common nuisance." The statute originated in the Uniform Narcotic Drug Act passed by Congress in 1938, 52 Stat. 785.

**11.** *See* 100 Stat. 3207–52 and 114 Stat. 1230.

herself engaged in storing, keeping or selling crack cocaine. A person may be guilty of the offense of maintaining such a house or premises, even though his conduct or her conduct is otherwise unobjectionable. It's not necessary that the person who maintains the dwelling or the place promote the specified purposes, if he or she knowingly permits the premises to be used for those purposes.

We are satisfied that these instructions were sound. As the trial court recognized, one may "knowingly maintain" premises without being an owner, renter, or even a resident thereof. A person who exercises "dominion and control" over a house "maintains" the house. *United States v. Verners*, 53 F.3d 291, 296 (10th Cir.1995). "Acts evidencing such matters as control, duration, acquisition of the site, renting or furnishing the site, repairing the site, supervising, protecting, supplying food to those at the site, and continuity are . . . evidence of knowingly maintaining the place considered alone or in combination with evidence of distributing from that place." *Clavis*, 956 F.2d at 1091; *accord, Verners*, 53 F.3d at 296.

■ Regarding the second interpretive question—how to construe the statutory requirement that the premises be "used for" keeping or selling controlled substances—the trial court instructed the jury that "a single act of keeping or selling crack cocaine in a certain place, even by the person who maintains that place, is not enough to make the place a crack house." The government apparently agreed with that proposition in this case.[12] Construing the analogous "purpose" requirement of 21 U.S.C. § 856(a)(1), the federal courts have held that illegal drug activity need not be the sole purpose for which the premises are used, *see, e.g., United States v. Roberts*, 913 F.2d 211, 220 (5th Cir.1990), but that it must be a "significant" purpose, *United States v. Soto–Silva*, 129 F.3d 340, 346 n. 4 (5th Cir.1997), if not, "at least in the residential context, . . . one of the primary or principal uses to which the house is put." *Verners*, 53 F.3d at 296 (stating also that drug activity "must be more than a mere collateral purpose of the residence"). Ultimately, adjectives such as "significant" and "principal" may not be too helpful, but there are two ends of the spectrum that can be identified. On the one hand, it is fair to say that our statute, like its federal counterpart, "was designed to punish those who use their property to run drug businesses—hence, the more characteristics of a business that are present, the more likely it is that the property is being used" in violation of the statute. *Id.* at 296–97. On the other hand, D.C.Code § 33–542(a)(5), like 21 U.S.C. § 856(a)(1), "cannot reasonably be construed" to proscribe "simple possession and personal consumption of drugs in one's residence." *United States v. Lancaster*, 296 U.S.App.D.C. 379, 382, 968 F.2d 1250, 1253 (1992). "The 'casual' drug user does not run afoul of [the statutory] prohibition because he does not maintain his house for the purpose of using drugs but rather for the purpose of residence, the consumption of drugs therein being merely incidental to that purpose." *Id.*

■ In this case, there was ample evidence—some of it from the defendants themselves, especially Christina Durant—

12. We do not suggest that this instruction was incorrect on the facts presented at trial, but we caution that it may be too sweeping a statement to be correct under all circumstances. We would suppose, for example, that leasing a warehouse or other building to store a single drug shipment or consummate a single drug transaction there would fall squarely within the statutory prohibition.

that Apartment 204 was not maintained primarily for residential purposes. The jury readily could infer that after Mrs. Durant moved out, the apartment was kept and used mainly for what it appeared to be when the police executed the search warrant—a drug storage and distribution situs. As we have discussed, there also was sufficient evidence to link appellants with the drugs found during the search. Finally, though it was Mrs. Durant who paid the rent, the evidence that appellants had possessed keys to the unit, had kept their personal belongings there, and had been using and occupying the premises for some time, demonstrated that appellants were far from being casual visitors. From all the circumstances, the jury fairly could infer beyond a reasonable doubt that each appellant shared dominion and control over the apartment (along with Mrs. Durant). We therefore conclude that sufficient evidence was introduced at trial to prove each appellant guilty of knowingly keeping or maintaining an apartment used for keeping and selling crack cocaine.

### 3. Possession of a Prohibited Weapon

 Appellants were convicted of possessing the semi-automatic Beretta handgun found at 1520 Holbrook Street in violation of (former) D.C.Code § 22–3214(a).[13] In pertinent part, the statute provides that "[n]o person shall within the District of Columbia possess any machine gun . . . ." A "machine gun" for this purpose is "any firearm which shoots automatically or semiautomatically more than 12 shots without reloading." (Former) D.C.Code § 22–3201(c).[14] The detective who recovered the Beretta testified that its magazine con-

tained fifteen rounds of ammunition and that the weapon test-fired "approximately thirteen times" without being reloaded. Uncontroverted, this testimony was sufficient proof that the Beretta qualified as a machine gun under the statutory definition.

Moore argues that in order to convict him of violating § 22–3214(a), the government had to prove that he was aware of the specific physical characteristics that made the Beretta a prohibited weapon under the statute—*i.e.*, that he knew the Beretta could be fired more than twelve times without reloading. In making this argument, Moore relies on the Supreme Court's decision in *Staples v. United States*, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), which construed the National Firearms Act to require proof of such *mens rea*. Although we deal here with a different statute, there is some support for Moore's argument in our case law as well; *see Turner v. United States*, 684 A.2d 313, 315 (D.C.1996) (stating that under § 22–3214(a), the government "had to prove that appellant knowingly and intentionally possessed a machine gun").

In *In re D.S.*, 747 A.2d 1182, 1187 (D.C. 2000), however, we rejected the argument that Moore now advances. That case concerned a prosecution under § 22–3214(a) for possession of a sawed-off shotgun. Invoking *Staples*, the appellant in *D.S.* contended that the government was required to prove that he knew the shotgun found in his possession had a barrel length of less than 20 inches, which is the defining characteristic of a "sawed-off shotgun" for purposes of § 22–3214(a).[15] We disagreed. The premise of the statute is that certain

---

**13.** Recodified as D.C.Code § 22–4514(a) (2001).

**14.** Recodified as D.C.Code § 22–4501(c) (2001).

**15.** *See* (former) D.C.Code § 22–3201(b), recodified as D.C.Code § 22–4501(b) (2001).

weapons, including sawed-off shotguns and machine guns, are "so highly suspect and devoid of lawful use that their mere possession is forbidden" (with an exception for legitimate military or law enforcement use). *United States v. Brooks*, 330 A.2d 245, 247 (D.C.1974). Appreciating that "Congress intended to create a general intent crime, such that the mere possession of certain enumerated weapons is unlawful," we held it "sufficient for the government to demonstrate ... that D.S. knowingly and intentionally possessed a shotgun and that that shotgun's barrel in fact was less than twenty inches in length." *D.S.*, 747 A.2d at 1186.[16] In other words, under the statutory scheme that Congress enacted for the District of Columbia, anyone who knowingly and intentionally possesses a weapon in this jurisdiction does so at his or her own risk; in effect, the law obligates such a person to make sure the weapon is not of the prohibited variety.[17]

▮▮ On the authority of *D.S.*, we hold that the government was not required to prove that appellants knew the firing capabilities of the Beretta handgun recovered at 1520 Holbrook Street in order to convict them of possession of a prohibited weapon.

It sufficed for the government to prove that appellants knowingly and intentionally possessed the gun and that the weapon in fact had the characteristics of an operable machine gun.

## B. Pre-trial Motions

### 1. Severance of Defendants

On the morning of the first day of trial (just before the jury was sworn), Moore's counsel announced that if the defendants were tried separately, his client "[would] be able to testify with regard to guns on behalf of Mr. Durant and Mrs. Durant." "He has knowledge that the gun doesn't belong to the co-defendants," Moore's counsel explained, but "he is not testifying in this case." Based on this information, the Durants orally moved for a severance, requesting that Moore's trial proceed first so that afterward they might avail themselves of his helpful testimony. Although Moore's counsel had not said that his client's willingness to testify for his co-defendants was conditioned on Moore's being tried first, that was the logical implication of his proffer, *see United States v. Wilson*, 11 F.3d 346, 354 (2d Cir.1993), and

---

**16.** As we acknowledged, the government also had to prove that the weapon was operable. *See id.*, 747 A.2d at 1187; *see also Turner*, 684 A.2d at 315 n. 4 (citing *Washington v. United States*, 498 A.2d 247 (D.C.1985)). (In *Washington*, we reversed a conviction for possession of a sawed-off shotgun because the trial court refused a request to instruct the jury that the shotgun had to be operable.)

**17.** Our holding in *D.S.* may be subject to a qualification. The weapon considered by the Supreme Court in *Staples* was subject to the registration requirements of the National Firearms Act only because its mechanism had been modified. The modification was hidden, or at least not apparent on visual inspection, and the owner of the weapon plausibly had claimed to be unaware of it. In contrast, as we pointed out in *D.S.*, the short barrel of a sawed-off shotgun is not at all hidden, but

rather is "visible to anyone looking at the weapon." 747 A.2d at 1186. In light of the rest of our discussion in *D.S.*, we do not take our comments about the obviousness of barrel length to mean that the government has the burden of proving knowledge of critical characteristics if they are not plainly visible. Our comments do suggest, however, that we did not necessarily mean to foreclose affirmative defenses based on excusable ignorance of such characteristics. *Cf. Worthy v. United States*, 420 A.2d 1216, 1218 (D.C.1980) (recognizing that "under some circumstances the defense of innocent or momentary possession might be applicable" to violations of § 22–3214(a)). That said, we leave the discussion of possible affirmative defenses for another day. No such defense was advanced in the present case.

Moore did not disabuse the other parties and the court of that understanding. It is easy to see why Moore would not waive his Fifth Amendment privilege against self-incrimination if the Durants were tried first—his voluntary testimony at their trial would be admissible against him at his subsequent trial, undermining his stated decision not to take the stand in his own case. The government opposed severance, and the trial court ultimately denied the motions. Citing *United States v. Ford*, 276 U.S.App.D.C. 315, 870 F.2d 729 (1989), the court identified the conditional nature of Moore's willingness to testify, the lateness of the request, and considerations of judicial administration and economy, as its reasons for not severing the trials of Moore and the Durants.

 On appeal, Durant argues that the trial court should have granted his severance motion not only because he wanted to call Moore as an exculpatory witness, but also for a second reason—because the evidence against his co-defendants was "far more damaging" than the evidence against him, resulting in his conviction due to the "spillover effect of guilt by association." Appellant's Brief at 30. We shall consider only the first reason, however, for Durant never raised the alleged disparity of the evidence as a ground for severance in the trial court, and plain error certainly has not been shown. *See Butler v. United States*, 614 A.2d 875, 882 n. 13 (D.C.1992); *see also* Super. Ct.Crim. R. 12(b)(5), (d) (providing that a request for severance not raised prior to trial is waived unless the court grants relief from the waiver "for cause shown").

 "When two or more defendants are charged with jointly committing a criminal offense, there is a strong presumption that they will be tried together." *King v. United States*, 550 A.2d 348, 352 (D.C.1988) (citation omitted). Even so, un-

der Superior Court Criminal Rule 14, the court may grant severance if it appears that a defendant or the government is prejudiced by joinder. This discretionary authority is to be exercised with caution, however; "a [trial] court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); *accord, Williams v. United States*, 884 A.2d 587, 593 (D.C.2005). "We will reverse the trial court's decision denying a motion for severance only upon a clear showing that it has abused its considerable discretion." *Sterling v. United States*, 691 A.2d 126, 135 (D.C.1997) (citation omitted). To demonstrate an abuse of discretion, a defendant must show that he suffered "manifest prejudice" from the joinder. *Id.* (internal quotation marks and citation omitted).

 "[A]mong the specific trial rights that a motion for severance is intended to secure is the right to present a defense and call witnesses on one's own behalf." *Williams*, 884 A.2d at 593. "[T]he fundamental character of that right is a major factor to be considered" in evaluating a defendant's request for severance. *Id.* at 594 (internal quotation marks and citations omitted); *see also Martin v. United States*, 606 A.2d 120, 127 (D.C. 1991). Nonetheless, Durant does not persuade us that the trial court abused its discretion in this case. Where a defendant seeks severance in order to call a co-defendant as an exculpatory witness, "the trial court should consider: (1) the exculpatory nature and effect of the proposed testimony, (2) the desire of the movant to present the testimony, (3) the willingness of the co-defendant to testify, and (4) the demands

of judicial administration." *Id.* at 594 (citations omitted).[18] "The burden lies with the moving party to satisfy the court that the testimony would be exculpatory in effect and that the co-defendant is reasonably likely to testify." *Id.* (citations omitted). Durant did not shoulder this burden.

 Most importantly, Durant failed the threshold requirement. The minimal proffer, that Moore "has knowledge that the gun doesn't belong to the co-defendants," withheld all the particulars of Moore's potential testimony. It was merely "an assertion of ultimate fact" that did not come close to "establishing with requisite specificity the exculpatory 'nature and effect' of his co-defendant's testimony." *Ford,* 276 U.S.App.D.C. at 318, 870 F.2d at 732 (quoting *United States v. Parodi,* 703 F.2d 768, 780 (4th Cir.1983)). *Compare Williams,* 884 A.2d at 591; *Martin,* 606 A.2d at 125–26. Such vague and conclusory proffers are insufficient because they do not enable the trial court (or this Court) to assess the value of the supposedly exculpatory testimony to the movant and the need for severance. *See Lumpkin v. United States,* 586 A.2d 701, 707 (D.C.1991); *King,* 550 A.2d at 352; *see also Ford, supra.*

Indeed, Moore's proffered testimony would not necessarily have been exculpatory at all, for Durant could have had constructive possession of the Beretta handgun even if it did not "belong" to him. (We do not rely on any evidence of ownership or "belonging" to hold that there was sufficient evidence of constructive possession to sustain Durant's convictions.) And given both its timing and its vagueness, the proffer was insufficient to trigger a duty on the party of the trial court *sua sponte* to press Moore's counsel for details of his client's potential testimony in a manner appropriately respectful of Moore's privilege against self-incrimination and counsel's ethical obligation to preserve his client's confidences and secrets. *See* D.C. R. Prof'l Conduct 1.6; *King,* 550 A.2d at 352–53; *see also Lumpkin,* 586 A.2d at 708.[19]

 Durant also did little to satisfy the trial court that Moore would be reasonably likely to testify if severance were granted. The condition that Moore's case be tried first reasonably led the trial court to doubt Moore's genuine willingness to testify. A defendant may have a legitimate reason for conditioning his willingness to testify on behalf of a co-defendant on his own trial

---

18. The federal case relied upon by the trial court stated that

 [t]o establish a prima facie case for severance ..., the movant must demonstrate: (1) a bona fide need for the testimony; (2) the substance of the testimony; (3) the exculpatory nature and effect of the testimony; and (4) the likelihood that the co-defendant will testify if the cases are severed. Once the movant makes that threshold showing, the trial court must then: (1) examine the significance of the testimony in relation to the defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the testimony; (3) consider the effects on judicial administration and economy; and (4) give weight to the timeliness of the motion.

 *Ford,* 276 U.S.App.D.C. at 317, 870 F.2d at 731. We have deemed the more elaborately

articulated *Ford* test to be "effectively identical" to the four-part test that our cases have used. *Williams,* 884 A.2d at 594 n. 11.

19. We have no reason to think that Moore's co-defendants could have proffered any details of his potentially exculpatory testimony. *Cf. Williams,* 884 A.2d at 600 n. 16:

 In a case where the proffer is not as specific as the one made in this case, the trial court, in its discretion, could well require a more detailed proffer as to the content and proposed timing of the testimony.... Subject to the limitations imposed by the Fifth Amendment privilege against self-incrimination, the trial court could also require more than the proffer of counsel, such as an affidavit or recorded deposition testimony....

being held first, since without such a condition he cannot provide evidence for the co-defendant without waiving his own privilege against self-incrimination. *See Williams*, 884 A.2d at 599. However, it is not unreasonable for courts to be wary of such contingent offers, recognizing that they may be designed to manipulate the proceedings. *See, e.g., Williams*, 884 A.2d at 598; *Ford*, 276 U.S.App. D.C. at 317, 870 F.2d at 731. Acknowledging the competing considerations, we have held that if "a defendant has vigilantly moved for severance in order to secure a co-defendant's genuinely exculpatory testimony, the consequential request to sequence the trials to safeguard the Fifth Amendment privilege of the witness ... should not, on its own, automatically lead to denial of the severance motion on the ground that the co-defendant is not reasonably likely to testify." *Williams*, 884 A.2d at 599. "Rather, it is one factor, although perhaps a significant one, to be considered in the context of a given case." *Id.* Here, however, Durant did not seek severance to secure Moore's testimony until the very morning of trial, and he made no effort to establish that Moore's testimony would be genuinely exculpatory. The vagueness of the proffer and its last-minute presentation only added to the legitimate doubts over Moore's willingness to testify, doubts which Durant did nothing to dispel.

Lastly, measured against the weak proffer and the conditional availability of the witness, the demands of judicial administration and economy to which the trial judge alluded also militated against granting severance. Nearly all of the government's evidence would have to have been re-presented if the Durants were tried separately from Moore (with concomitant inconvenience and risk that evidence will be lost). Moreover, unless Moore's trial resulted in an acquittal, he might retain (and presumably continue to assert) his privilege against self-incrimination until his appeals were concluded, so the Durants' trial could have been delayed for a long time—potentially, years.

### 2. Suppression of Evidence

Durant appeals the denial of his motion to suppress his statement that he lived at 1520 Holbrook Street, which he made when the police stopped his car. Durant argues that the police elicited that statement without first advising him of his Fifth Amendment rights, in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In rejecting that argument, the trial court credited the testimony of the officers who stopped and arrested Durant and ruled, *inter alia*, that he was not in custody for purposes of *Miranda*. We defer to the trial court's factual determinations, *see Prince v. United States*, 825 A.2d 928, 931 (D.C.2003), and we agree with the court's legal ruling.[20]

Detective James Zerega testified at the hearing on the motion that he attended a police debriefing prior to the execution of the search warrant at 1520 Holbrook Street. In the debriefing, the detective was informed of the report in the warrant affidavit that cocaine had been purchased in Apartment 204 from appellant Durant. He also was told that if Durant was not at the apartment, "he would probably be driving a [Chevrolet] Blazer with D.C. tags." The Blazer was described in fur-

---

**20.** Durant also argues, for the first time on appeal, that the police lacked probable cause to stop his vehicle, and that the trial court therefore should have suppressed not only his statement, but also the keys recovered from his car following his arrest. Because Durant did not raise this Fourth Amendment claim in the trial court, we do not consider it. *See, e.g., Brown v. United States*, 518 A.2d 415, 418 (D.C.1986).

ther detail and its license plate number was provided.[21] Later on, while the search of Apartment 204 was in progress, Detective Zerega observed a Blazer parked outside 1520 Holbrook Street with its motor running and two persons sitting inside it. After learning that contraband had been found in the search, Detective Zerega approached the vehicle on foot. Before he could reach it, the Blazer pulled away from the curb and drove off in a normal manner. Detective Zerega followed in his own car and radioed for uniformed officers in a marked police car to assist him in stopping the Blazer. Detective Zerega observed that the Blazer's license plate bore the number he had been provided at the debriefing.

The Blazer soon was stopped without incident. Detective Zerega walked to the driver's side of the vehicle and asked the driver for identification. The driver produced his license, which identified him as Clifton Durant. In response to the detective's further questions, Durant stated that he lived at 1520 Holbrook Street, Apartment 204 (though his license gave a different address). During this brief conversation, Durant remained seated behind the wheel of his car and Detective Zerega did not remove his gun from its holster or his handcuffs from their pouch. The detective did not physically restrain Durant or advise him that he was under arrest.

After speaking with Durant, Detective Zerega summoned Sergeant Donald Yates from Holbrook Street. Sergeant Yates had been videotaping the execution of the search warrant and was aware that Durant's personal papers had been found at the Holbrook Street apartment. Upon his arrival, Sergeant Yates made the decision, based on what had been discovered in the search of Apartment 204, to place Durant under arrest.[22]

Whether Detective Zerega was required to give Durant *Miranda* warnings before asking him where he lived depends not on whether Durant was free to depart without answering, but on whether he was in "custody." *See In re I.J.*, 906 A.2d 249, 255–56 (D.C.2006). "[N]ot every seizure constitutes custody for purposes of *Miranda*." *Id.* at 256 (internal quotation marks and citation omitted). " 'Custody,' for *Miranda* purposes, is present [only] when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' " *Id.* at 255 (quoting *California v. Beheler* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)); *see also Yarborough v. Alvarado,* 541 U.S. 652, 663, 124 S.Ct. 2140, 158 L.Ed.2d 938; *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). The test of custody is an objective one— "how a reasonable person in the suspect's situation would perceive his circumstances." *Alvarado,* 541 U.S. at 662, 124 S.Ct. 2140.

Durant had not yet been placed under formal arrest when Detective Zerega stood outside his vehicle, requested his driver's license, and asked him where he lived. A formal arrest was not effected until later, when Sergeant Yates arrived on the scene. Nor did Detective Zerega restrain Durant's freedom of movement to a degree associated with a formal arrest.

---

21. Because no Fourth Amendment claim is properly before us (and the question was not explored below), we do not decide whether the police had adequate support for the information that was furnished about Durant in the debriefing.

22. At some point it was determined that the passenger in the Blazer was appellant Moore, and he, too, was arrested.

A motorist who merely is stopped for roadside questioning "to determine his identity and to ... obtain information confirming or dispelling the officer's suspicions" is not considered to be in custody for *Miranda* purposes. *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *see, e.g., Basnueva v. United States,* 874 A.2d 363, 368 (D.C.2005); *Karamychev v. District of Columbia,* 772 A.2d 806, 809 (D.C.2001). No additional circumstances suggest that a reasonable person in Durant's position would have perceived himself to be in custody at the time Detective Durant questioned him. As in *Basnueva,* "the traffic stop and the questioning took place on a public street during daylight hours. Only a few questions were asked, and they were not particularly unusual." 874 A.2d at 369–70. Durant was not removed from his car, he was not handcuffed, and he was not told that he was going to be arrested. The detective did not draw his weapon from its holster. In short, there was no "show of authority" that would have conveyed the message to Durant that he was being taken into police custody, as opposed to being stopped temporarily. *I.J.,* 906 A.2d at 261.

As Durant was not subjected to *custodial* interrogation by Detective Zerega, *Miranda* warnings were not required. We therefore hold that the trial court did not err in denying Durant's motion to suppress his statement.

### C. Instructions Regarding Possession of a Prohibited Weapon

 Without objection, the trial court instructed the jury on the essential elements of the offense of possession of a prohibited weapon as follows:

The essential elements of this offense, the possessing of a prohibited weapon, each of which the government must prove beyond a reasonable doubt, are:

First. That the defendant possessed a semi-automatic handgun;

Second. That he or she did so knowingly and intentionally. This means consciously, voluntarily, on purpose, not mistakenly, accidentally or inadvertently.

As Moore argues, this instruction was deficient in two respects. First, possession of a semi-automatic handgun is not a violation of § 22–3214(a) unless the weapon is a machine gun, but the instruction omitted the statutory definition of a machine gun and did not require the jury to find that the defendants possessed such a weapon. Second, possession of a machine gun is not a violation of § 22–3214(a) unless the weapon is operable, see footnote 16, *supra,* but the instruction failed to inform the jury that operability is an essential element of the offense.[23]

 Moore correctly claims that the omission of appropriate instructions on the "machine gun" and operability elements of the offense infringed his Fifth Amendment right to due process and his Sixth Amendment right to trial by jury. *See United States v. Gaudin,* 515 U.S. 506, 510, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) ("[T]hese provisions require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt."). Where such a Constitutional error has been preserved by a timely objection at trial, the defendant is entitled to a new trial unless the error is shown to have

---

**23.** Moore also argues that the trial court erred in failing to instruct that the government was required to prove his knowledge of the specific characteristics of the handgun that brought it within the statutory proscription. We have disposed of that contention by our holding that such knowledge did not need to be shown.

been harmless beyond a reasonable doubt. *See Neder v. United States,* 527 U.S. 1, 15, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). In the present case, however, because there was no contemporaneous objection at trial to the erroneous instruction, the objection was forfeited. *See* Super. Ct.Crim. R. 30; *Curington v. United States,* 621 A.2d 819, 821 (D.C.1993). Moore's claim therefore is "subject to the strictures of 'plain error' review." *Thomas v. United States,* 914 A.2d 1, 8 (D.C.2006); *see Johnson v. United States,* 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (upholding conviction on ground that failure to submit element of offense to jury did not constitute plain error).

Under the established test for plain error, an appellant must show (1) an error that is (2) "plain" and that (3) adversely affected the appellant's "substantial rights." *Johnson,* 520 U.S. at 467, 117 S.Ct. 1544. "If all three [of those] conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* In this case, it suffices to say that the third condition is not satisfied.

The instructional errors in this case were not "structural." *See Neder, supra.* To show that a nonstructural error affected his substantial rights, an appellant must show a reasonable probability that the error had a prejudicial effect on the outcome of his trial. *Thomas,* 914 A.2d at 21 (citations omitted). We do not find that either appellant has made that showing here. The testimony at trial, that the semi-automatic Beretta handgun recovered on Holbrook Street had fifteen rounds of ammunition in its clip and test-fired more than twelve shots without reloading, established that the weapon was an operable machine gun. As there was no evidence or argument to the contrary, we see no reasonable probability that a properly instructed jury would have found otherwise.

**D. Exposure of the Jury to Prejudicial Evidence Not Admitted During Trial**

Both Moore and Durant seek reversal because the jury was exposed to prejudicial evidence that had not been admitted during trial. The issue arose less than a hour after the jury began its deliberations, when the court received a note stating that the jurors had "found something interesting." Indeed they had. The jury had discovered three ziploc bags in a small denim coin purse that had been admitted in evidence, and one of those ziploc bags contained an unidentified white powder (presumably, cocaine). The denim purse was part of a government exhibit holding the contents of the larger purse belonging to Christina Durant that the police had seized at the Holbrook Street apartment. Neither the prosecutor nor defense counsel had known that the ziplocs and white powder were in the denim purse before it was sent to the jury.[24] The three ziplocs were different in appearance from the 91 ziplocs found in the bedroom of the Holbrook Street apartment, which were in another government exhibit.

All three defendants moved for a mistrial when the jury's discovery was an-

---

**24.** There was another unsettling discovery yet to be made. After the trial exhibits were retrieved from the jury, defense counsel examined Christina Durant's larger purse. Inside it, they found a smaller leather purse containing a previously unnoticed 10-inch folding knife. There is no indication that the jury was ever aware of this knife, which was removed and not returned to the jury room. Appellants sought no relief with respect to their discovery of the knife.

nounced. Jury deliberations were suspended while the mistrial motions were argued. In the extensive discussion that ensued, the court asked how appellants were prejudiced by the jury's exposure to the three ziplocs in Christina Durant's coin purse. Appellants' counsel responded that the three ziplocs were *Brady*[25] material as to their clients; had they been aware of them before trial, counsel argued, they would have pursued a different strategy, utilizing the ziplocs to tie Christina Durant to the drugs and gun found in the bedroom of the Holbrook Street apartment. The court disagreed with that argument, ruling that Mrs. Durant's possession of the ziplocs in her purse was not exculpatory as to appellants. Concluding that the inadvertent introduction of the ziplocs had not prejudiced appellants, the court denied their motions for a mistrial, though it granted a mistrial to Christina Durant.

With counsel's consent, the trial court then delivered a lengthy curative instruction to the jury, in pertinent part as follows:

> ... I want to speak to you for a few moments about the coin purse you all discovered among the papers that were introduced into evidence as Government's Exhibit 16 and identified as ... material found in defendant Christina Durant's purse. The change purse, the little denim change purse that you discovered in there and its contents, whatever they are, are not part of this case. We don't even know whatever the substance is that's in that bag. We don't know what it is. It's never been analyzed by any chemist to identify its nature.
>
> And I am, therefore, instructing you to disregard it entirely ... [A]nd by the way, I have removed it from Government's Exhibit 16. Nevertheless, it was

in a plastic—in this plastic evidence bag with other material that were associated with the defendant Christina Durant, and only her. And in all fairness to Mrs. Durant, because of the situation here, I am going to be removing her case from your consideration at this time, and you will not be considering the guilt or innocence of Mrs. Durant any further in this case.

> Now, let me instruct you additionally in this matter. I told you before, a few moments ago, that we don't even know what the substance is. There is absolutely no evidence in the case connecting this coin purse or its contents to either of the other two defendants. There is no evidence suggesting that it has any association, whatsoever, with them. So, I am going to instruct you to continue in your deliberations as to the defendant Clifton Durant and as to the defendant Mr. John Moore. I am going to instruct you in these deliberations to disregard entirely the coin purse and its contents, because as I told you before, it is not part of the case against Christina Durant, not part of the evidence against Christina Durant, and it's certainly not part of the evidence against Mr. Clifton Durant or Mr. John Moore.
>
> So those are my instructions to you at this time. We will be returning the exhibits to you this morning for you to continue your deliberations, absent the coin purse and you may continue your deliberations at this time.

The jury withdrew at 11:35 a.m. to resume deliberations, and at 12:08 p.m., the jury reached a verdict, finding Moore and Durant guilty on all counts.

In this court, appellants principally contend that the jury's improper exposure to the ziplocs in Mrs. Durant's purse

---

**25.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

was inherently and incurably prejudicial. In support of that contention, appellants point to the speed with which the jury reached its verdict after discovering the ziplocs as evidence that the jury was swayed to convict them. Assuming, *arguendo*, that appellants preserved this claim of prejudice for appellate review (though they made a *Brady* claim in the trial court), we are not persuaded by it.[26]

 "[T]he proper standard for evaluating a claim of prejudicial error when an unauthorized object is inadvertently or mistakenly transmitted to the jury room is whether the judgment of the jury was substantially swayed by the presence of the unauthorized evidence in the jury room." *Vaughn v. United States*, 367 A.2d 1291, 1295 (D.C.1977) (internal quotation marks and citations omitted); *accord, Edwards v. United States*, 785 A.2d 292, 294–95 (D.C.2001). If "the improperly admitted evidence could not have 'substantially swayed' the jury," the trial court did not abuse its discretion by denying appellants a mistrial. *Parker v. United States*, 601 A.2d 45, 53 (D.C.1991) (citations omitted).

 The ziplocs found in Mrs. Durant's coin purse were not connected to either of appellants and did not necessarily implicate them in any offense. Conversely, there was substantial incriminating evidence apart from the ziplocs against each defendant. Moreover, we have no reason to doubt the efficacy of the trial court's emphatic curative instruction, which directed the jury to "disregard entirely" Mrs. Durant's coin purse and its contents and emphasized that there was "absolutely no evidence" connecting the purse or its contents with either appellant. Juries are presumed to have followed unambiguous instructions given by the trial court, and we "will not upset the verdict by assuming that the jury declined to do so." *Harris v. United States*, 602 A.2d 154, 165 (D.C. 1992) (en banc) (internal quotation marks and citation omitted). All things considered, we are satisfied that the unauthorized evidence did not "substantially sway" the jury to find Moore or Durant guilty of any offense. We therefore conclude that the trial court did not abuse its discretion in denying appellants' motions for a mistrial, and that reversal of their convictions on account of the jury's exposure to the ziplocs in Mrs. Durant's purse is not warranted.

### III.

For the foregoing reasons, we affirm appellants' convictions.

---

**26.** As to the *Brady* claim, we agree with the trial court's assessment. Even if the additional evidence was probative of Mrs. Durant's guilt, it was not thereby probative of appellant's innocence. The presence of ziplocs and (we may assume, for the sake of argument) cocaine in Mrs. Durant's purse did nothing to undermine the force of the independent evidence of appellants' guilt. Thus, we fail to see any reasonable probability that pretrial disclosure of the ziplocs to appellants would have produced a different verdict. *See Rowland v. United States*, 840 A.2d 664, 687 (2004).

Durant also argues that the trial court erred by not finding, *sua sponte*, that government agents had tampered with the evidence in bad faith. This argument is without merit; in the trial court, Durant disavowed any claim of tampering, and the evidence of record would not have supported such a finding.