# District of Columbia
# Court of Appeals

**No. 15-CF-309**

JEROME PROCTOR, JR.,

Appellant,



MAR **16** 2017

**DISTRICT OF COLUMBIA COURT OF APPEALS**

v.

CF2-10780-14

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia<br>Criminal Division

BEFORE: BLACKBURNE-RIGSBY and MCLEESE, *Associate Judges;* and REID, *Senior Judge*.

## J U D G M E N T

This case was submitted to the court on the transcript of record and the briefs filed, and without presentation of oral argument. On consideration whereof, and for the reasons set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that appellant's drug and drug paraphernalia convictions are affirmed; his unlawful possession of a firearm (prior conviction) ("FIP") and ammunition feeding device convictions are reversed; and the case is remanded to the trial court for re-sentencing.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: March 16, 2017.

Opinion by Senior Judge Inez Smith Reid.

Opinion by Associate Judge Roy W. McLeese, concurring in part and dissenting in part.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CF-309

JEROME PROCTOR, JR., APPELLANT,

FILED 3/16/17
District of Columbia
Court of Appeals
Julio Castillo
Clerk of Court

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF2-10780-14)

(Hon. Lynn Leibovitz, Trial Judge)

(Submitted May 19, 2016                     Decided March 16, 2017)

*Richard S. Stolker* was on the brief for appellant.

*Channing D. Phillips*, United States Attorney, and *Elizabeth Trosman*, *John P. Mannarino*, *Laura Crane*, and *Daniel J. Lenerz*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY and MCLEESE, *Associate Judges*, and REID, *Senior Judge*.

Opinion for the court by *Senior Judge* REID.

Opinion by *Associate Judge* MCLEESE, concurring in part and dissenting in part, at page 24.

REID, *Senior Judge*:  A jury convicted appellant, Jerome Proctor, Jr., of

misdemeanor possession with intent to distribute marijuana (less than one half

pound) ("PWID"), in violation of D.C. Code § 48-904.01 (a)(1) (2012 Repl.); unlawful possession of a firearm (prior conviction) ("FIP"), in violation of D.C. Code § 22-4503 (a)(1) (2012 Repl.); possession of a large capacity ammunition feeding device, in violation of D.C. Code § 7-2506.01 (b) (2012 Repl.); and possession of drug paraphernalia, in violation of D.C. Code § 48-1103 (a).[1] For the reasons stated below, we affirm Mr. Proctor's drug and drug paraphernalia convictions, but we reverse his FIP and ammunition feeding device convictions.

## FACTUAL SUMMARY

The government presented evidence primarily through its main witness, Officer James Love of the Metropolitan Police Department ("MPD"). Officer Love testified that on June 18, 2014, he and other officers were in plain clothes in an unmarked car when they noticed a vehicle with a non-working brake light. The vehicle came to a halt in front of 4877 F Street, in the Southeast quadrant of the District of Columbia, and the officers conducted a traffic stop.[2] The driver of the

---

[1] The trial court acquitted Mr. Proctor of possession of an unregistered firearm ("UF") and unlawful possession of ammunition ("UA"), and the jury found him not guilty of possession of more than one half pound of marijuana with intent to distribute, and not guilty of possession of a firearm during a crime of violence.

[2] The stop apparently took place in the early evening.

vehicle identified himself as Jerome Proctor. Officer Love noticed a "very strong odor of marijuana," coming from the vehicle. Mr. Proctor informed Officer Love that he had "just smoked" marijuana. The officers asked Mr. Proctor and the passenger in the front seat to exit the vehicle.[3]

Following the exit of the occupants, the officers searched the car.[4] The search of the center console revealed a sandwich bag with a green weed substance, $270, mail bearing Mr. Proctor's name, and an identification card for Mr. Proctor. In the backseat, Officer Love noticed a black, plastic carry-out bag – the type of bag that "you can't see inside of it" – that contained a green weed substance, and a digital scale.

Not long after the stop of the car that Mr. Proctor was driving, Officer Herbert Nicholls, one of the officers involved in the search of the car, obtained a

---

[3] The passenger was Quintin Buckmon; he was arrested with Mr. Proctor. However, the charges against him were dismissed prior to the trial of Mr. Proctor and Ms. Johnson.

[4] The car was registered to Mr. Proctor's baby's mother, Shaunita Johnson, a co-defendant with whom Mr. Proctor resided at the F Street address.

warrant to search the F Street residence.[5] Officers Love and Nicholls, and other MPD officers executed the warrant approximately three hours after the traffic stop. Several females and males were in the home, including Ms. Johnson.[6] When the officers reached the third floor of the home, they entered one of the bedrooms (bedroom one).[7] Officer Love removed the mattress from the bed and noticed a CVS bag. He "basically dumped the bag out . . ., dumped it out onto the ground." Inside was a blanket wrapped around a Glock 9 millimeter handgun, "children's

---

[5] At a probable cause hearing on June 20, 2014, Officer Nicholls, whose last name was recorded as "Nicholos," stated that Ms. Johnson was on the second floor stairwell when the officers entered the home, and that Mr. Proctor had indicated that Ms. Johnson owned the home. Counsel for Ms. Johnson stated that the home was left to Ms. Johnson by her grandparents. At the hearing on July 14, 2014, during which Mr. Proctor and Ms. Johnson entered not guilty pleas to their indictment, counsel for Ms. Johnson asserted that the F Street home was in Ms. Johnson's name and had been left to her by her grandmother.

[6] Officer Robert Buck gathered the names of those present in the house, and testified that there were four adults and two children in the house at the time of the search. At the doorway as the officers entered the house was an adult female, Alexis Gainey, holding a one month-old baby, Q.B., Jr. On the second floor stairway, in between the second and third floors, Officer Buck saw three adults – Ms. Johnson, Doniece (phonetic) Flood, and Kevin Johnson, and a small child.

[7] Officer Love indicated that there were three bedrooms on the third floor – one "to the left," one "directly in front" of the top of the stairs, and "one at the very end" (bedroom one).

drawings"[8] with the name Jerome Proctor, mail from the SunTrust Bank addressed to Jerome A. Proctor, Jr. at the F Street address, and some currency. The magazine inside the gun contained fifteen cartridges and another cartridge was in the chamber of the gun. On the dresser in the bedroom was an identification card for Ms. Johnson. Inside the closet an officer saw male and female clothing, as well as two bags containing green weed and empty sandwich bags. A male's jacket contained currency in different denominations.[9]

Sherri Tupik, a chemist with the Drug Enforcement Agency testified that the bags recovered from the car driven by Mr. Proctor, and the bag recovered from bedroom one contained marijuana.

---

[8] The trial court described the drawings as follows: "[I]t looks like one of those school handwriting strips that kids use to write their cursive or whatever." Jerome Proctor's name was written in the strip.

[9] Officer Alex Spradling, who was involved in the traffic stop and the search of the F Street home, testified about the items he saw in the car and bedroom one. He concentrated on the search of the closet in the bedroom and did not watch Officer Love as he searched under the bed, although he heard a thump, turned and saw the pistol on the ground. He confirmed the items removed from the closet. At the June 20, 2014, probable cause hearing, Officer Nicholls testified that he found $150 near the Glock, two clear plastic bags of a green weed in a plastic container in the closet, $2180 in the pocket of a male's jacket in the closet and a clear zip with marijuana was found downstairs in a storage room.

The trial court qualified Officer Michael Jewell as "an expert in the distribution, use and pricing of marijuana in the District of Columbia and in the relationship between guns in (sic) the drug trade in the District of Columbia." Officer Jewell acknowledged that he did not participate in the arrests in this case and had no first-hand knowledge about the facts of this case. He stated that the amount of marijuana recovered from the closet in bedroom one amounted to 28.6 grams, or an ounce which would sell for $150 on the street. Counsel for Ms. Johnson asked whether he had seen an ounce "used as personal use"; he replied, "Sure." With respect to the marijuana discovered in the car, Officer Jewell asserted that the amount taken from the console was 27.8 grams, which also would be sold on the street as an ounce. The amount discovered in the black, plastic bag in the back seat amounted to 249 grams (226 grams would be one-half of a pound), or about 9 ounces; it would be sold at a price between 6 and $700 wholesale. Officer Jewell has seen individuals with that amount of marijuana for personal use, but not very often. He testified that depending on the amount of money a drug dealer is making and how comfortable a drug dealer is where the sales are being made, "a lot of time there's a gun present somewhere around where that dealer is," to protect the money and the stash.

After the government rested its case, the trial court denied its motion to

admit firearms and ammunition registration certificates because the government failed to lay the proper foundation for the admission of business records. Mr. Proctor and Ms. Johnson moved for judgment of acquittal on those two counts (counts 4 and 5), UF and UA, and the trial court granted their motions. Following discussion, the trial court denied Mr. Proctor's motion for judgment of acquittal as to all other charges. With respect to Ms. Johnson, the court granted the motion for judgment of acquittal on the PWID charge because there was no evidence to connect her to the car and no evidence that she was the owner of the house. With respect to the charge of possession of a firearm during a crime of violence, the court stated, "that I would have to grant as well because even with the marijuana in the closet, it would not be applicable."[10] The trial court also granted Ms. Johnson's motion for judgment of acquittal with regard to the drug paraphernalia charge, and hence, Ms. Johnson was "excuse[d]" from the case. The trial court informed the jury that "[Ms. Johnson's] charges are no longer a part of the case," and the jury "should not speculate" about the legal reasons for her departure as a codefendant.

---

[10] During the January 12, 2015, hearing Mr. Proctor made an oral motion to sever his case from that of Ms. Johnson, essentially because she claimed the gun was hers and he feared that her statement would have a spillover effect on him. The government proffered its intention to introduce Ms. Johnson's statements that she purchased the gun illegally, had touched it and it was hers, and that on the day of the incident she "moved the gun from the car to her house." Further, the government's theory at trial would be that Mr. Proctor and Ms. Johnson jointly had constructive possession of the gun.

The defense presented three witnesses. Ms. Johnson, a special police officer, testified that she was on the third floor when the police entered her home. Others who occupied the home besides herself and Mr. Proctor were her brother, his girlfriend, Mr. Proctor's mother, and Mr. Proctor's younger brother and sister. She stated that she bought the 9 millimeter Glock so that she could "get [her] credentials to become an armed special police officer." When she heard the police downstairs in the house on the day of the search, she wrapped the gun in the blanket and put it in a CVS bag under the bed; the bag contained her son's schoolwork. The mail addressed to Mr. Proctor was never in the bag; it was under the bed. On cross-examination, Ms. Johnson claimed that Mr. Proctor had shown her how to load the gun. She acknowledged that she had told a police officer that she moved the gun back and forth between her car and the F Street home, and earlier on the day of the incident she had moved the gun from the car to the house.

Quintin Buckmon, the passenger in the car driven by Mr. Proctor, was initially arrested in this matter, but his case was dismissed. He stated that he bought the marijuana that was in the car, and that the scale found in the car belonged to him. Tanya Hall, who occupied another bedroom on the third floor, had a sixteen-year-old and a twelve-year-old child who also occupied the F Street home. She testified that she and her children used a closet in bedroom one because

the closet in her room was small. She stored her marijuana in the closet in bedroom one, and she and her young daughter and son would watch TV in that bedroom.

**ANALYSIS**

**The Search and Seizure**

Mr. Proctor argues that, based on his pre-trial probable cause contention, the trial court "erred in admitting evidence seized from a sealed container in the back seat of the car driven by [him] at the time of his arrest, and in admitting evidence seized pursuant to a search warrant of his bedroom." He asserts that, "[e]ven if not specifically framed as a motion to suppress, this [c]ourt should determine that the evidence obtained in violation of the Fourth Amendment was improperly admitted in evidence, and reverse [his] conviction under the plain error standard.

The law of this jurisdiction clearly states that, "A motion . . . to suppress evidence shall be made before trial unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion." D.C. Code § 23-104 (a)(2) (2012 Repl.); *see also* Super. Ct. Crim. R. 12 (b)(3). Moreover, "[f]ailure to

file a motion to suppress before trial is treated as a waiver of any claim that the evidence was unlawfully seized, absent a showing of exceptional circumstances." *Olafisoye v. United States*, 857 A.2d 1078, 1085 (D.C. 2004) (citation omitted); *see also* Super. Ct. Crim. R. 12 (d). If no exceptional circumstances are shown, as here, there is a waiver, and "we are precluded from considering th[e] argument on direct appeal." *Watley v. United States*, 918 A.2d 1198, 1200 (D.C. 2007) (citation omitted).

During his probable cause hearing, Mr. Proctor's counsel "ask[ed] the [c]ourt not to find possession with the intent to distribute marijuana, but simple possession of marijuana." Counsel raised no explicit argument regarding suppression of items seized from the car or the bedroom. At the plea hearing following his indictment on seven counts, Mr. Proctor reserved "all of [his] Fifth and Sixth Amendment rights," but not his Fourth Amendment rights. Subsequently, he did not file a motion to suppress prior to trial. Hence, he clearly waived any challenge to the search and seizure, and we do not consider his search and seizure claim.

**Sufficiency of the Evidence**

*The Parties' Arguments*

Mr. Proctor contends that the evidence was insufficient beyond a reasonable doubt to sustain his FIP and his possession of a large capacity feeding device convictions. He argues that although he shared bedroom one with Ms. Johnson, she owned the F Street home and "[h]e was not present [in the home] at the time of the premises search." He also contends that the factors this court has recognized as connecting a defendant to the contraband in a constructive possession case ("evidence linking the accused to an ongoing criminal operation of which the possession is a part, attempts to hide or destroy evidence, other acts evincing consciousness of guilt such as flight, and evidence of prior possession of contraband") are not "present in the instant case." He claims that the government did not "prove beyond a reasonable doubt that [he] knew of the presence of the firearm, had the power to exercise dominion and control over it, and that he intended to exercise dominion and control over it."

The government argues that "[a]mple evidence supported [Mr. Proctor's] constructive possession of the loaded firearm found in his bedroom." Specifically,

the government points to the following: (1) "[t]he CVS bag in which officers found the gun also contained . . . mail from SunTrust bank addressed to [Mr. Proctor] at [the F] Street [address], and crayon drawings with the name 'Jerome Proctor' on one of them," (2) in the closet of bedroom one the police officers found $2,180 in the pocket of a man's jacket, paperwork with [Mr. Proctor's] name on it, and a plastic box containing empty sandwich bags and two clear knotted bags containing marijuana," (3) "[t]he car [Mr. Proctor] was driving, which stopped right outside [the F] Street [home], contained additional marijuana – some of which was in the center console with [Mr. Proctor's] I.D. – and a digital scale," and (4) the testimony of the government's expert "that such scales and sandwich bags are used in the drug trade, and that guns are used to protect dealers, their drugs and their money."

### *Standard of Review and Applicable Legal Principles*

"In a sufficiency challenge[,] we view the evidence in the light most favorable to the government, draw all reasonable inferences in the government's favor, and defer to the factfinder's credibility determinations." *Medina v. United States*, 61 A.3d 637, 641 (D.C. 2013) (internal quotation marks and citation omitted). "Although the government is entitled to any reasonable inferences, [a

court reviewing an insufficiency-of-the-evidence claim] must consider all of the evidence including that favorable to the defendant." *Schools v. United States*, 84 A.3d 503, 508 (D.C. 2013) (brackets in original, internal quotation marks and citation omitted). "[T]he evidence is sufficient if, after viewing it in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Evans v. United States*, 122 A.3d 876, 887 (D.C. 2015) (internal quotation marks and citation omitted). However, "[w]e have an obligation to take seriously the requirement that the evidence in a criminal prosecution must be strong enough that a [factfinder] behaving rationally really could find guilt beyond a reasonable doubt." *Id.* (brackets in original, internal quotation marks omitted) (citing *Rivas v. United States*, 783 A.2d 125, 136 (D.C. 2001) (en banc)).

"To prove constructive possession of drugs, weapons, or other contraband, the evidence must show that the accused knew of its presence and had both the ability and intent to exercise dominion and control over it." *Moore v. United States*, 927 A.2d 1040, 1050 (D.C. 2007) (citation omitted). "Constructive possession may be sole or joint and may be proven by direct or circumstantial evidence." *Id*. (internal quotation marks and citation omitted). "[T]here must be something more in the totality of the circumstances – a word or deed, a relationship

or other probative factor – that, considered in conjunction with the evidence of proximity and knowledge, proves beyond a reasonable doubt that [appellant] *intended* to exercise dominion or control over the drugs, and was not a mere bystander." *Rivas*, *supra*, 783 A.2d at 136. But, "[W]here knowledge and ability to exert control over contraband are shown, the additional evidence necessary to prove constructive possession is comparatively minimal." *Moore*, *supra*, 927 A.2d at 1050 (internal quotation marks and citation omtted). "Evidence showing the accused's control or occupancy of the premises in which the contraband is found may also serve to prove constructive possession." *Id*. (citations omitted). "The inference that a person who occupies an apartment has dominion and control over its contents applies even when that person shares the premises with others, although it is plainly not as strong an inference in that circumstance." *Id*. (internal quotation marks and citation omitted); *see also Schools*, *supra*, 84 A.3d at 509.

### *Discussion*

In *Evans*, *supra*, this court extensively reviewed prior case law in this jurisdiction concerning constructive possession of contraband, and that review need not be repeated here. We analyzed the evidence in those cases, *id*. at 888-92, to determine what result should be reached in *Evans*. In doing so, we made three

general observations, which we follow in this case: (1) "[w]hether constructive possession has been proved beyond a reasonable doubt in any given case depends on a fact-specific inquiry into all of the circumstances," (2) "broad language in our opinions must be understood in context," and (3) "there can be an important distinction between concluding that given evidence would reasonably permit a jury to infer constructive possession and concluding that the same evidence is by itself sufficient to establish constructive possession beyond a reasonable doubt." *Id.* at 892-93 (internal quotation marks and citations omitted).

We first focus on the fact-specific inquiry emphasized in *Evans* and on *Evans*'s reminder that "broad language 'must be understood in context'" or in light of the factual picture of a given case. *Id.* at 893. In doing so we are mindful that in an insufficiency of the evidence claim, we view the evidence and reasonable inferences in favor of the government, *Medina*, *supra*, 61 A.3d at 641, but we "must consider all of the evidence including that favorable to the defendant." *Schools*, *supra*, 84 A.3d at 508. The evidentiary picture in this case (based on the evidence presented at trial and the representations of the parties) includes the following:

(1) Officers found 28.6 grams (one ounce) of marijuana, $270, and mail and identification belonging to Mr.

Proctor in the center console of the car Mr. Proctor was driving;

(2) Officers recovered a black, plastic bag from the rear seat of the car containing 249 grams of marijuana (somewhat more than one half of a pound) and a scale; Mr. Buckmon testified for the defense that he bought that marijuana and the scale belonged to him;

(3) In bedroom one of the F Street home, occupied by Ms. Johnson and Mr. Proctor, the police found a CVS bag under the bed containing a gun wrapped in a blanket, SunTrust Bank mail addressed to Mr. Proctor, and what the trial court described as a "school handwriting strip[] that kids use to write their cursive or whatever." Written on the strip was the name Jerome Proctor. Ms. Johnson testified for the defense that she bought the gun so that she could obtain her credentials as an armed special police officer, and that she would move the gun from her car to the house, as she did on the day of the incident; she wrapped the gun in the blanket and put it in the CVS bag with her son's school work. Mr. Proctor's mail from SunTrust was on the floor but not in the CVS bag;

(4) Officers found marijuana in a closet in bedroom one and the amount tested was 28.6 grams (one ounce); Ms. Hall testified for the defense that she stored her marijuana in that closet and others in her family placed items in that closet;

(5) Government expert, Officer Jewell, who was not involved in executing the search warrant and had no first-hand knowledge about this case, made a general statement about the relationship between a gun and the drug trade – "a lot of time there's a gun present somewhere around where the dealer is," to protect the drug dealer's money and stash;

(6) Statements were made at the probable cause hearing by Ms. Johnson's trial counsel that Ms. Johnson owned the F Street home, that she inherited it from her grandmother;

(7) The search warrant and accompanying affidavit

showed that Ms. Johnson owned the car that Mr. Proctor was driving at the time the police stopped him;

(8) Officer Buck testified that in the F Street home on the second floor staircase, between the second and third floors, he saw three adults when he executed the search warrant – Ms. Johnson, her brother, and her brother's girlfriend – and he encountered one other adult on the first floor holding a baby who apparently was Mr. Buckmon's son; the search warrant was executed not long after the police stop of the car Mr. Proctor was driving.

Although neither the gun nor the bag containing the gun was in plain view in the bedroom,[11] the government's emphasis on the presence of Mr. Proctor's bank statement in the bag with the gun (to establish at least his knowledge of the gun) reflects our prior case law.[12] *See Schools*, *supra*, 84 A.3d at 510 ("We have often found that evidence was sufficient to establish a defendant's constructive possession of contraband where the contraband was recovered in proximity to the

---

[11] In contrast, in *Evans*, *supra*, one gun was in plain view in a bedroom closet leaning against the wall, and we said that a second gun in a closet in a different bedroom was "apparently unhidden." *Id*. at 188.

[12] The government also points to the child's drawing bearing the name Jerome Proctor, but given the trial court's description of that item as a "school handwriting strip that kids use to write their cursive or whatever," and with no other evidentiary explanation about Ms. Johnson's and Mr. Proctor's child (e.g. initials, age), or about the handwriting on the strip, it would be quite speculative to conclude either that Mr. Proctor would include his child's handwriting strip in a bag with a loaded gun, or that he rather than Ms. Johnson or someone else in the house placed the school handwriting strip in the CVS bag with the gun.

defendant's personal items such as mail or personal papers, photographs, and identification cards."); *see also Evans*, *supra*, 122 A.3d at 893 (citing *Schools* for the proposition that "constructive possession can be adequately established by proof that contraband was found near defendant's personal items"); *Smith v. United States*, 55 A.3d 884, 887, 890 (D.C. 2012) (where a backpack containing a firearm is "conspicuously located in [a] bedroom near [an occupant's] personal items," "a juror may infer that the occupant has both knowledge of its presence and intent to exercise dominion and control of the contraband"). But, in *Curry v. United States*, 520 A.2d 255 (D.C. 1987), we recognized that the presence of others at a residence where a gun was found might impact the fact that a defendant's personal items were discovered with the gun. Our discussion of *Curry* in *Evans* noted that "five others were present at the time of search and could have hidden the gun among defendant Curry's belongings." 122 A.3d at 892. Similarly, here, other adults including Ms. Johnson lived in the F Street home, and at the time of the search of the premises three adults were encountered on a staircase between the second and third floors of the home, including Ms. Johnson, her brother and his girlfriend, and another adult was at the doorway on the first floor holding a child, apparently Mr. Buckmon's son. It is reasonable to infer that all of the adults on the staircase had access to bedroom one.

The fact-specific inquiry in this case raises questions about the constructive possession of the gun – the ownership of the gun and access to bedroom one. In light of the fact that Mr. Proctor was not in the home when the concealed gun was found, "did not have exclusive access" to the F Street home or bedroom one, and indeed apparently owned neither the F Street home nor the gun, the government had a "heavy burden" to prove Mr. Proctor's constructive possession of the gun. *Curry*, *supra*, 520 A.2d at 264. As *Evans* declared, "there can be an important distinction between concluding that given evidence would reasonably permit a jury to infer constructive possession and concluding that the same evidence is by itself sufficient to establish constructive possession beyond a reasonable doubt." *Id.* at 893.

In that regard, there is yet another principle, relating to the presence of others in the premises where contraband is found that impacts not only the significance of the proximity of a defendant's personal items to the contraband, but also the element of intent to exercise dominion and control over the contraband. *Curry*, *supra*, declared that, "In cases where the accused is a resident of premises to which others have access, courts will not normally impute possession of an illegal item without proof that the accused is actually involved in some criminal enterprise of which the contraband is a part." *Id.* at 264. Undoubtedly, in light of

the criminal enterprise principle, the government highlights what it calls "significant evidence linking [Mr. Proctor] to a 'criminal enterprise' of which the gun was a part" – items removed from the closet (the $2180 found in the male's jacket, marijuana, plastic sandwich bags, and paperwork containing Mr. Proctor's name); items in the car (marijuana in the center console and the digital scale on the backseat); and the general testimony of an expert witness about the use of guns by drug dealers. But, we have recognized that this type of evidence may not be sufficient to establish constructive possession of a gun. As we said in *Schools*, *supra*, "evidence that a defendant was found . . . to be involved in . . . illegal activity consisting of drug distribution is not necessarily enough to show that the loaded pistol [found in a bedroom during the search] was part of that operation when there were others present in the apartment where the gun was found." *Id*. at 511 (internal quotation marks, alterations, and citation omitted); *see also Curry*, *supra*, 520 A.2d at 263 ("[P]roximity or association may establish a prima facie case of constructive possession *if it is colored by evidence linking the accused to an ongoing criminal operation of which that possession is a part.*") (emphasis added).

The government not only had the burden to show that Mr. Proctor knew of the location of the gun and ammunition, but also to establish the link between the

gun and a criminal enterprise in order to prove Mr. Proctor's intent to exercise dominion and control over the gun. The government's evidence of Mr. Proctor's connection to the gun, however, was quite thin and depended in large part on the presence of the gun (with a piece of Mr. Proctor's mail) in the bag underneath the bed in which he slept with Ms. Johnson. There was no government witness who testified that Mr. Proctor had been seen previously with the gun, or that he had been observed selling drugs, or that he had been seen or found in an area known for its drug trade. The government's evidence was furthered weakened (1) by the fact that Ms. Johnson also occupied the bedroom where the gun was found, testified that she purchased the gun and that Mr. Proctor's mail was not in the CVS bag; (2) by the fact that Mr. Proctor was not in the residence when the gun was found and there was no evidence as to how long he had been away from the F Street home the day of the incident; (3) by the fact that during the search of bedroom one, Officer Love dumped the contents of the CVS bag on the floor, and there was no testimony that he looked to see whether anything else was on the floor before he dumped the contents of the bag onto the ground; (4) by the fact that there was no clear link or reasonably inferable link between the ounce of marijuana found in the center console of the car that Mr. Proctor was driving and the tested ounce of green weed found in the closet of bedroom one, let alone a clear or reasonably inferable link between those relatively small quantities of marijuana

and an ongoing criminal enterprise; (5) by the fact that the government presented no evidence clearly linking Mr. Proctor, rather than Mr. Buckmon, to the 249 grams of marijuana in a black, plastic bag on the back seat of the car he was driving; and (6) by the fact that there was no evidence about the male jacket in the closet in bedroom one from which $2180 was removed, given the fact that others also had access to that closet.

Nor could a reasonable and justifiable inference that Mr. Proctor intended to use the gun in drug dealing be drawn from Officer Jewell's general expert testimony. Officer Jewell prefaced his testimony about use of a gun in drug dealing by saying that use depended on the amount of money a drug dealer is making and where the sales are being made, and further that even though drug dealers get robbed, that does not mean that police "get guns off of every dealer out on the street." Officer Jewell's general testimony that "a lot of time there's a gun present somewhere around where the dealer is," would not be strong enough to establish the link between the gun found under the bed in the F Street home and Mr. Proctor's involvement in a criminal enterprise. That testimony is quite "speculative," *see Schools*, *supra*, 84 A.3d at 512, in the factual context of this case, and does not clearly prove Mr. Proctor's intent to exercise control over the gun under the bed in connection with drug dealing, signaling his involvement in a

criminal enterprise.

"A reasonable jury perhaps could find it *more likely than not*" that Mr. Proctor knew the gun was in Ms. Johnson's home, but not that the evidence was strong enough to prove beyond a reasonable doubt that Mr. Proctor knew the gun was in the bedroom under the bed in a CVS bag and he had the intent to exercise control or power over the gun in association with a drug dealing criminal enterprise. *See Rivas*, *supra*, 783 A.2d at 134, 135. What we said in *Rivas* about Mr. Rivas is true of Mr. Proctor here – "perhaps Rivas is probably guilty[,] but on the thin record of this case, a reasonable doubt about his guilt ineluctably remains." *Id*. at 138.

Finally, we are again mindful of the reminder in *Evans*, *supra*, that "there can be an important distinction between concluding that given evidence would reasonably permit a jury to infer constructive possession and concluding that the same evidence is by itself sufficient to establish constructive possession beyond a reasonable doubt." *Id*. at 893; *see also Rivas*, *supra*, 783 A.2d at 134 ("Proof beyond a reasonable doubt is not merely a guideline for the trier of fact; it also furnishes a standard for judicial review of the sufficiency of the evidence."). On this record and in light of applicable legal principles, we cannot conclude that the

government established Mr. Proctor's constructive possession of the gun in the bedroom beyond a reasonable doubt. As we have seen in Mr. Proctor's case, the gun was not in plain view and others in the F Street home had access to the bedroom where the gun was concealed. Furthermore, the evidence presented to establish Mr. Proctor's involvement in a criminal enterprise was neither strong nor compelling. Hence, we cannot say that the government proved that Mr. Proctor was "actually involved in [a] criminal enterprise of which the [gun] was a part." *Curry*, *supra*, 520 A.2d at 264.

Accordingly, for the foregoing reasons, we affirm Mr. Proctor's drug and drug paraphernalia convictions, but we reverse his FIP and ammunition feeding device convictions and remand this case to the trial court for re-sentencing.

*So ordered.*

MCLEESE, J., concurring in the judgment in part and dissenting in part: I agree with the court that Mr. Proctor is not entitled to relief based on the Fourth Amendment claim he raises for the first time in this court. I respectfully dissent, however, from the court's holding that the evidence was insufficient to support Mr.

Proctor's convictions for unlawful possession of a firearm by a felon and unlawful possession of a large-capacity ammunition-feeding device.

**I.**

In brief, the evidence at trial was as follows. Mr. Proctor was stopped in front of 4877 F St., SE, for a traffic infraction. The car he was driving smelled strongly of unburnt marijuana. Inside the center console, the police found an ounce of marijuana in a sandwich bag, $270 in cash, mail addressed to Mr. Proctor, and an identification card for Mr. Proctor. In the back seat were a digital scale in plain view and approximately one-half pound of marijuana concealed in an opaque plastic bag. Mr. Proctor had $320 in cash on his person. The passenger in the car, Quintin Buckmon, was also searched, but nothing was recovered from his person. Mr. Proctor was arrested.

Approximately three hours later, police officers executed a search warrant at 4877 F St. Four adults and two children were in the home at that time, including Shaunita Johnson, the mother of Mr. Proctor's son. In one of the three bedrooms

on the third floor of the home, police found a CVS bag under a mattress. The bag contained a loaded handgun; an unspecified quantity of cash; mail from SunTrust Bank addressed to Mr. Proctor at 4877 F St.; and children's drawings, one of which had the name Jerome Proctor written on it. On a dresser in the same bedroom, police found an identification card for Ms. Johnson and mail addressed to Ms. Johnson at 4877 F St. In a closet in that bedroom, the police found men's and women's clothing; $2,180 in cash in the pocket of a men's jacket; paperwork with Mr. Proctor's name on it; and a clear box, inside of which were some empty sandwich bags and two clear bags containing over an ounce of marijuana.

An expert testified that the half-pound of marijuana found in the car could be purchased for $600 to $700 and could be sold on the street for approximately $2400 if broken down into smaller quantities. The two ounces of marijuana (one in the car console and one in the bedroom closet) each had a street value of approximately $150. Scales are typically used to weigh quantities of marijuana for sale, and sandwich bags are often used to package marijuana for sale. The expert also testified that "a lot of time[s]" drug dealers keep a gun around to protect themselves, their drugs, and their money.

Mr. Proctor called three witnesses. Ms. Johnson testified that she and her son lived with Mr. Proctor in the bedroom in which the handgun was found. According to Ms. Johnson, the handgun was hers, and she hid the handgun in the CVS bag when she heard the police entering to execute the search warrant. Ms. Johnson testified that the mail addressed to Mr. Proctor was not in the CVS bag but instead was on the floor under the bed. Mr. Buckmon, the passenger in the car, testified that he lived with Mr. Proctor at 4877 F St. and that they were good friends. According to Mr. Buckmon, the marijuana in the car was his. Finally, Mr. Proctor's mother Tonya Hall testified that she lived in one of the other bedrooms at 4877 F St., that she used the closet from which the marijuana was recovered, and that the marijuana in that closet was hers.

## II.

Mr. Proctor does not dispute that the evidence was sufficient to support his conviction for possession of marijuana with the intent to distribute. Mr. Proctor does contend that the evidence was insufficient to support a conclusion that he possessed the handgun found in the CVS bag. I would hold to the contrary.

The applicable standard of review is well settled:

> In considering a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the government, giving full play to the right of the [fact-finder] to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence. . . . The evidence is sufficient if, after viewing it in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . Although a fact-finder is entitled to draw a vast range of reasonable inferences from evidence, the fact-finder may not base a verdict on mere speculation. Appellate review of the sufficiency of the evidence is not toothless, and we have an obligation to take seriously the requirement that the evidence in a criminal prosecution must be strong enough that a fact-finder behaving rationally really could find guilt beyond a reasonable doubt.

*Evans v. United States*, 122 A.3d 876, 887 (D.C. 2015) (brackets, citation, and internal quotation marks omitted).

To establish that Mr. Proctor constructively possessed the handgun at issue, the United States was required to prove beyond a reasonable doubt that Mr. Proctor knew of the presence of the handgun, had the power to exercise dominion and control over the handgun, and intended to exercise such dominion and control. *E.g.*, *Evans*, 122 A.3d at 887. The United States's theory at trial was that Mr. Proctor was selling marijuana and possessed the handgun to protect his drug-dealing activities. In my view the jury could reasonably accept that theory. It

appears to be undisputed that the evidence permitted the jury to conclude that Mr. Proctor was selling large quantities of marijuana and generating significant amounts of cash, and expert testimony indicated that drug dealers often keep guns for protection. Moreover, it appears to be undisputed that Mr. Proctor stayed in the bedroom in which the handgun was found. That bedroom also contained marijuana, a significant amount of cash, and drug-packaging materials. The jury's finding of guilt is thus strongly supported by the principle that "proof of constructive possession may be furnished by evidence linking the accused to an ongoing criminal operation of which that possession is a part." *Burnette v. United States*, 600 A.2d 1082, 1084 (D.C. 1991) (internal quotation marks omitted).

As the court notes, *ante* at 20, we have rejected a bright-line rule that there is always sufficient evidence to support a conviction for possessing a gun if the defendant is involved in drug-dealing and the gun is found in an apartment that the defendant shares with others. *Schools v. United States*, 84 A.3d 503, 509-12 (D.C. 2013). In the present case, however, the jury's verdict finds strong support from another critical circumstance: the handgun was found not merely in the bedroom where Mr. Proctor stayed, but in a bag that contained mail addressed to Mr. Proctor. As we explained in *Schools*, "We have often found that evidence was sufficient to establish a defendant's constructive possession of contraband where

the contraband was recovered in proximity to the defendant's personal items such as mail or personal papers, photographs, and identification cards." *Id.* at 510.

Viewing the totality of the evidence in the light most favorable to the jury's verdict, I conclude that the jury acted reasonably in finding that Mr. Proctor constructively possessed the handgun at issue. We have in a number of cases upheld findings of constructive possession based on comparable or weaker evidence. *See, e.g.*, *Smith v. United States*, 55 A.3d 884, 886–90 (D.C. 2012) (sufficient evidence that defendant constructively possessed contraband inside child's backpack in master bedroom of apartment defendant occupied; although others also occupied apartment and contraband was not in plain view, backpack was conspicuous and located near items belonging to defendant, and evidence indicated that defendant had been alone in master bedroom for week before police search discovered contraband in backpack); *Stewart v. United States*, 395 A.2d 3, 6 (D.C. 1978) (sufficient evidence that defendant Stewart constructively possessed marijuana in apartment where defendant Stewart lived; although another defendant also lived in apartment and defendant Stewart was not present at time of search; apartment contained substantial quantity of marijuana, readily observable throughout apartment, including on dresser in bedroom near items bearing defendant Stewart's name); *Hooker v. United States*, 372 A.2d 996, 996–97 (D.C.

1977) (sufficient evidence that defendant constructively possessed contraband found in bedroom occupied by defendant in home defendant shared with mother; although contraband was not in plain view and others "might have had occasional access to the room," bedroom contained defendant's personal belongings; some contraband was in nightstand; and some contraband was in dresser drawer that contained papers bearing defendant's name and what could be inferred to be defendant's underwear).

I am aware of no decision, from this court or any other, holding that comparable evidence was insufficient to support a jury's finding of constructive possession. In the two cases upon which the court principally relies -- *Schools* and *Curry v. United States*, 520 A.2d 255 (D.C. 1987) -- the evidence that the defendants constructively possessed a weapon was substantially weaker than the evidence in the present case. In *Schools*, it was unclear whether the defendant usually occupied the bedroom from which the gun was recovered. 84 A.3d at 510. Moreover, as we emphasized, "there was no evidence that any mail or papers, photographs, wallet, identification cards, or any other personal effects linked to appellant were found in the back bedroom where the gun and ammunition were found." *Id.* In the present case, by contrast, it is undisputed that Mr. Proctor was

staying in the bedroom at issue, and papers linked to Mr. Proctor were not just in the bedroom but were in the same bag as the handgun.

In *Curry*, a loaded handgun was found hidden among women's clothing in a drawer of a bedroom nightstand. 520 A.2d at 260. We held that the evidence was insufficient to support a finding that Ms. Curry possessed that handgun, because although personal papers in her name were on a dresser in same bedroom, she shared the apartment with others and there was evidence that she stayed there intermittently; two other male defendants were convicted of conducting a drug-selling operation from the apartment; Ms. Curry was not present at the time of the search and was not shown to have been present in the preceding five hours; and five others were present at the time of the search and could have hidden the handgun among Ms. Curry's possessions. *Id.* at 260, 264-65. As to the two male defendants, we held that the evidence was insufficient because they did not sleep in the apartment; the handgun was in a bedroom hidden among women's clothing; others had access to the apartment and were present at the time of the search; and no evidence tied the handgun to drug-selling. *Id.* at 265-66. Among the critical differences between *Curry* and the present case are (1) in the present case there was evidence that drug-dealers often use guns for protection; (2) in the present case the handgun was in the same bedroom as some of the marijuana, drug-packaging

material, and a substantial amount of cash, which strengthens the inference that the handgun was possessed in connection with drug-dealing activities; and (3) in the present case, Mr. Proctor was both directly involved in the drug-dealing operation and closely tied to the handgun by the personal papers found in the bag with the handgun.

In holding that the evidence in this case in insufficient, the court in my view missteps in several additional respects. First, the court treats as "part of the evidentiary picture in this case" information that was not admitted into evidence at trial, including "representations of the parties" and testimony from non-trial proceedings. *Ante* at 4 n.5, 15-18. As the words "sufficiency of the *evidence*" indicate, in determining whether the evidence was sufficient we are limited to considering the evidence presented at trial. *See, e.g.*, *Malvino v. Delluniversita*, 840 F.3d 223, 232 (5th Cir. 2016) ("Once a trial has taken place, the focus is on the evidence actually admitted at trial and not on the earlier pretrial filings.") (internal quotation marks omitted). Second, the court does not view the evidence in the light most favorable to the jury's verdict, instead for example relying on the speculative possibility that a police officer was mistaken in testifying that Mr. Proctor's personal papers were in the CVS bag. *E.g.*, *ante* at 21. Third, the court without explanation dismisses the expert testimony about the frequent association

between guns and drug-dealing as "quite speculative . . . in the factual context of this case." *Ante* at 22. *Cf., e.g.*, *Reed v. United States*, 828 A.2d 159, 163 (D.C. 2003) (in assessing sufficiency of the evidence, court notes, "The fact that appellant was in possession of a knife and a large quantity of drugs at the same time is also significant; as has often been observed, drugs and weapons go together.") (internal quotation marks omitted). Fourth, the court erroneously considers particular items of inculpatory evidence in isolation, rather than considering the evidence in its totality. *Ante* at 20-23. *See, e.g.*, *In re K.M.*, 75 A.3d 224, 235 n.6 (D.C. 2013) ("[T]he sufficiency of the evidence must in the end be assessed in light of the evidence taken as a whole, viewed in the light most favorable to the [fact-finder's] findings," rather than by "weigh[ing] various pieces of evidence in isolation . . . ."); *cf. Bynum v. United States*, 133 A.3d 983, 988 (D.C. 2016) ("Although each fact viewed individually may not point unerringly to the appellant as possessing the requisite guilty knowledge, when taken as a whole, together with their legitimate inferences, they permit a finding of such guilty knowledge beyond a reasonable doubt.") (internal quotation marks omitted). Finally, the court impermissibly relies on testimony presented by Mr. Proctor that the jury was free to, and apparently did, discredit. *Ante* at 21 (relying on Ms. Johnson's testimony that she purchased the handgun and that Mr. Proctor's personal papers were not in the bag with the handgun). *See, e.g.*, *Bassil v. United*

*States*, 147 A.3d 303, 308 (D.C. 2016) ("Our obligation to view the evidence in the light most favorable to the prosecution almost always commands that we assume that the jury in its assessment of credibility did not believe the defendant's exculpatory testimony, and we must defer to the jury's prerogative in this area.") (brackets and internal quotation marks omitted).

For the foregoing reasons, I would hold that the evidence was sufficient to support the jury's finding that Mr. Proctor was guilty of possessing the handgun at issue. I would therefore affirm Mr. Proctor's convictions for unlawful possession of a firearm by a felon and unlawful possession of a large-capacity ammunition-feeding device. I respectfully dissent from the court's contrary conclusion.