*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-CF-223

ZAID R. ABED, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-19843-17)

(Hon. Steven N. Berk, Trial Judge)

(Argued February 24, 2022　　　　　　　　　Decided July 14, 2022)

*Gregory M. Lipper* for appellant.

*David B. Goodhand*, Assistant United States Attorney, with whom *Channing D. Phillips*, Acting United States Attorney at the time the brief was filed, and *Elizabeth Trosman* and *Angela N. Buckner*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and BECKWITH, *Associate Judges*, and THOMPSON, *Senior Judge*.

THOMPSON, *Senior Judge*: Following a bench trial, appellant Zaid Abed was convicted of carrying a pistol without a license[1] ("CPWL"), unlawful possession of

---

[1] *See* D.C. Code § 22-4504(a) (2022 Supp.).

a firearm[2] ("UF"), and unlawful possession of ammunition[3] ("UA").  He appeals his convictions, arguing that (1) the government offered no evidence to prove his lack of license or registration during its case in chief, such that his motion for judgment of acquittal ("MJOA") should have been granted; (2) in light of the trial judge's comments at the close of evidence, the convictions were barred by the Double Jeopardy and Due Process Clauses; and (3) the convictions were preempted by the Law Enforcement Officers Safety Act ("LEOSA").[4]  For the following reasons, we affirm.

## I.

The trial court heard evidence on October 7, 2019, and on November 26, 2019.  The evidence established that during the early morning hours of November 19, 2017, appellant received a phone call from his girlfriend, Allison Griggs, asking for a ride home from a friend's apartment located on Minnesota Avenue,

---

[2] *See* D.C. Code § 7-2502.01(a) (2018 Repl.).

[3] *See* D.C. Code § 7-2506.01(3) (2018 Repl.).

[4] *See* 18 U.S.C. § 926B.

S.E., in the District of Columbia. Appellant, an off-duty Prince George's County, Maryland, police officer, had been at dinner with friends in Arlington, Virginia, where, according to his trial testimony, he only took a few sips of a cranberry-vodka cocktail with his dinner. Griggs had also been out with a group of friends — Stephanie Coronado, Glen Higgins, and Mustafa Briggs — and each of them was "pretty drunk" by the time Griggs called appellant. Griggs and her friends had taken a taxi to Coronado's apartment, and Griggs and Higgins (who was drunk to the point of "stumbling") had helped Coronado into her apartment and then gone back outside to retrieve Briggs (who was "so inebriated that he couldn't walk"). The group had accidentally locked themselves out of Coronado's apartment building, so the three of them were sitting on the steps outside the building when appellant arrived.

Appellant was driven to Coronado's home by his friend "Jimmy." Appellant got out of the car and approached Coronado's building alone. At the time, appellant had his service firearm on him. Security camera footage admitted and played at trial depicts appellant, wearing a buttoned suit jacket, walking toward the apartment building with the handle of his firearm, which was tucked into a waistband holster on his right hip, resting on the outside of the jacket and plainly visible as he approached the group. Appellant came to a stop in front of the group,

unbuttoned his jacket, and stood with his hands in his pockets and with his jacket spread open, continuing to expose the holstered firearm.[5]  Higgins — the only one of the group of friends who was called to testify at trial — testified that he observed appellant approach with a "gun on his hip," which led him to ask appellant whether he "had an open carry or something like that."

Appellant then spoke with Higgins, Briggs, and Griggs.  The conversation escalated to an argument in which Higgins, according to his testimony, told appellant that he was sleeping with Griggs, a statement he made in order to "antagonize" appellant.[6]  Briggs then stood up, walked towards appellant, and got "in his face," and appellant pushed him away.  Appellant testified that he saw Briggs reach into his waistband as he told appellant, "I'll f***ing shoot you." Appellant explained that his police training, which taught him that people often keep weapons in their waistbands, "kicked in," so he pulled out his weapon and shouted, "police, show me your hands."  Higgins testified that appellant pulled out

---

[5] Appellant admitted at trial that his gun was "exposed" on his hip at that point, but he told the court that he had not realized it was exposed.

[6] Appellant testified that Higgins also threatened to "beat," "shoot," and "cut" appellant, though Higgins testified that he did not remember saying those things.

his gun, pointed it at Briggs with his finger not on the trigger, and then after "a second or two," reholstered it.

After the weapon was reholstered, appellant, Higgins, and Briggs engaged in a physical altercation, with Higgins and Briggs repeatedly punching appellant. Appellant's friend Jimmy came to help appellant, and the two of them eventually separated from the group, got into Jimmy's car, and drove away. At some point after they left, appellant realized that he had lost his weapon in the altercation, so he called 911 to report the lost weapon. The 911 dispatcher told him that police officers had already arrived at Coronado's apartment building and instructed him to return there. Appellant did as instructed and, once back at the apartment building, spoke to Metropolitan Police Department Detective Lockett and Officer Herring.

Detective Lockett testified that appellant had "appeared to be inebriated" based on his "pattern of speech," including "rambl[ing] on." Officer Herring testified that appellant's walk was not a "steady gait," his speech was "somewhat slurred," and his odor was "consistent with an alcoholic beverage emanating from his person." Neither officer performed any tests to ascertain appellant's sobriety or blood-alcohol level.

Appellant was arrested and indicted on ten counts: three counts of assault with a dangerous weapon ("ADW," counts one, three, and five); three counts of possession of a firearm during a crime of violence ("PFCV," counts two, four, and six); one count of threatening to injure and kidnap another person (count seven); and one count each of CPWL (count eight), UF (count nine), and UA (count ten).

The parties stipulated during the bench trial that appellant was off duty and had his service firearm, magazine, and ammunition on him at the time of the incident. The stipulation did not address, however, whether appellant was licensed to carry a firearm in the District of Columbia or whether his firearm was registered in the District, and no testimony or documentary evidence was presented during the government's case in chief regarding whether appellant had a license to carry his firearm in the District or had registered it in the District. Once the government rested its case, appellant moved for a judgment of acquittal on counts eight, nine, and ten. He did not assert that there was a lack of evidence regarding his firearm license or registration status but argued that he was protected from prosecution on those counts by LEOSA, which provides in relevant part:

> Notwithstanding any other provision of the law of any State or any political subdivision thereof, an individual who is a qualified law enforcement officer [and is "not under the influence of alcohol

or another intoxicating or hallucinatory drug or substance"] and who is carrying the identification required by subsection (d) [i.e., "photographic identification issued by the governmental agency for which the individual is employed that identifies the employee as a police officer or law enforcement officer of the agency"] may carry a concealed firearm that has been shipped or transported in interstate or foreign commerce . . . .

18 U.S.C. § 926B(a), (c)(5), and (d); *see also* 18 U.S.C. § 926C (permitting concealed carry by retired law enforcement officers). The government argued that LEOSA did not shield appellant from prosecution because his weapon was not concealed and because, as shown by the testimony of Officers Lockett and Herring, he was "under the influence of alcohol."

Appellant also moved for a judgment of acquittal on count seven, arguing that no evidence had been presented that he had threatened to injure or kidnap anyone, and on counts one through six, arguing that he had acted in self-defense. The court granted the motion as to count seven but denied it as to all the other counts, reasoning that there was enough evidence, viewed in the light most favorable to the government, to support them.

Appellant moved forward with his defense case, during which he testified in his own defense. On cross-examination, the following exchange occurred between the prosecutor and appellant:

> Q. Okay. But you don't have a license to carry a weapon in D.C.; right?
>
> A. No.
>
> Q. And that gun isn't registered in D.C.; right?
>
> A. It's Prince Georges County, my service weapon.

After closing arguments on November 27, 2019, the trial court began to issue its findings, starting with a summary of the facts of the case and remarking, "There's so much we don't know." Noting that appellant "was at the bar in Arlington for four-and-a-half hours," the court expressed skepticism that appellant had "only had two sips of a drink" and found that appellant "probably had more to drink than that." But the court also found that "it was reasonable for [appellant] to pull out his gun because he was in imminent danger of harm to him[self]," and therefore, found appellant not guilty on counts one through six.[7]

---

[7] The court later explained that appellant "pulled his gun out briefly for one or two seconds when he either saw a flash or thought somebody was drawing a gun on him."

As for count eight (CPWL), the court remarked that it was "at a loss" because it did not "think there[ was] enough in the record for [the court] to make a ruling on that," but it was "just not sure." The court decided to give the parties a week to brief the issue of whether LEOSA applied. The court then had the following exchange with the prosecutor (Ms. Buckner) regarding counts nine and ten:

> THE COURT: . . . And I'm going to dismiss or find [appellant] not guilty on counts nine and ten, the UF and UA [charges]. And, Ms. Buckner, I may be wrong and you can file a motion to reconsider, but I didn't – there doesn't appear to be any evidence in the record on those two charges. I didn't see any. Unless there's a stipulation, I didn't see. There wasn't –
>
> THE PROSECUTOR: There's not.
>
> THE COURT: I'm sorry?
>
> THE PROSECUTOR: There's not a stipulation. I can brief on that. The defendant admitted that he did not have a license to carry and did not register his firearm in D.C.
>
> THE COURT: All right.
>
> THE PROSECUTOR: And I can brief those issues.
>
> THE COURT: If that's enough to – you know, then we can deal with that at the time.

The court then summarized its decision as follows:

> So, as to counts one through six, not guilty. As to count – count seven, I believe was dismissed before trial. And, as to count eight, I will hold that decision in abeyance based on the briefing that I receive from the parties . . . . And UF, UA, I'll keep that in abeyance as well and wait for the government's memorandum.

Defense counsel then asked for clarification as to whether the court was dismissing counts nine and ten (UF and UA) subject to the government's motion for reconsideration, or holding them in abeyance and the court responded:

> I'm going to give Ms. Buckner the opportunity – or the government the opportunity to file something that illustrates that they had made a case for UA [and] UF. At present, I don't – I didn't see the evidence in the record. Or at least – and so I'm allowing them to keep the record open with respect to those two charges.

The parties subsequently filed the contemplated briefs, and in his brief, appellant asked the court to reconsider its initial denial of his MJOA on counts eight, nine, and ten. The government's brief called its failure to present licensing and registration evidence during its case in chief "inadvertent" and asked the court to "allow the government to reopen its case" if it found the evidence on those counts to be insufficient.

When the proceedings reconvened on December 16, 2019, the court remarked that it was "not completely convinced that [appellant] only had two sips

of liquor" and found that appellant "had more alcohol that night tha[n] he's testified to." The court then found that appellant's gun was not concealed during the incident, given that "there were several occasions that evening where [appellant] sort of flashed the gun" and that the video footage showed him "almost pulling his jacket back to show Allison's friends, for lack of a better word, that he was carrying a gun." Interpreting LEOSA as "contemplat[ing] a much more complete concealment" than the way appellant was carrying his firearm, the court concluded that appellant was not entitled to the exception created by LEOSA. The court clarified that if the firearm had been "unconceal[ed]" only during the two seconds that appellant pulled it out to point it at Briggs, its ruling would have been different. The court added that it also did not think appellant carried his photo identification in the manner required by the statute.

Having found that appellant was "not entitled to th[e] exception set forth in the L[EOSA] statute," the court heard arguments from the parties regarding whether there was sufficient evidence to support a conviction on counts eight, nine, and ten, given that the government had not produced any evidence on those counts in its case in chief. After the arguments, the court postponed its ruling a second time in order to "look at these issues more carefully."

When court reconvened on February 27, 2020, the court announced that it found appellant guilty of CPWL, UF, and UA. Citing *Moore v. United States*, 927 A.2d 1040 (D.C. 2007), the court reasoned that it had "to look back at the whole trial," including "the evidence that's accrued during the defendant's case . . . , [a]nd in [appellant's] testimony, [he] clearly testified that [he] didn't have a license for this gun." Regarding whether the original MJOA was decided incorrectly, the court found that "a reasonable person could infer that, as a police officer, [appellant] didn't have a license for that gun in D.C."[8] As to the "LEOSA exception," the court remarked that "the facts seem to clearly show that [appellant was] not concealing this weapon."

## II.

As noted above, appellant contends in this appeal that he is entitled to reversal of his convictions for three reasons. First, he argues that even when the

---

[8] The court's reasoning seemed to track the prosecutor's argument that "the fact that [the firearm] was [appellant's] service weapon in P.G. County" "could cause a reasonable fact finder to infer there [was] no license and registration [in the District of Columbia]."

evidence is viewed in the light most favorable to the government, the court erred in denying his MJOA because nothing in the government's case in chief proved or supported an inference that appellant lacked the required license and registration, and the government should not have been allowed to fill in the gaps during cross-examination in the defense case. Second, appellant asserts that the trial court initially "acquitted" appellant on all counts, such that the convictions the court subsequently announced violated the Due Process and Double Jeopardy Clauses. Third, appellant urges that his convictions were precluded by LEOSA. For the following reasons, we disagree with each of appellant's arguments.

**A.**

Appellant argues first that, although he did not specifically address the government's failure to produce evidence of his lack of license and registration in his initial MJOA, he did not forfeit the point, adding that he in fact addressed it in his post-trial brief asking the court to reconsider its denial of the MJOA. He cites the principle that "a general motion for acquittal . . . is deemed sufficient to preserve the full range of challenges to the sufficiency of the evidence." *Newby v. United States*, 797 A.2d 1233, 1238 (D.C. 2002) (internal quotation marks omitted). He implicitly urges us to apply that rule here even though his initial

MJOA (at least arguably) was not a "general motion for acquittal," but instead asserted an affirmative (LEOSA) defense. Quoting *Campbell v. United States*, 163 A.3d 790 (D.C. 2017), appellant also asserts that counsel's specific arguments in support of an MJOA in a bench trial should not "operate to un-preserve other arguments." *Id.* at 793. We have left such forfeiture questions open in the past, *see id.* at 794, and we see no reason to resolve them today, especially given that the government has not pressed for a forfeiture ruling. We shall assume without deciding that appellant's insufficiency-of-the-evidence argument was not forfeited.

That said, the additional hurdle appellant faces is what we have frequently referred to as the "waiver rule" — i.e., the principle that "[i]n general, a sufficiency challenge is to be evaluated in light of all the evidence adduced at trial, including any inculpatory evidence presented in the defense case, even if the government's evidence by itself would have been insufficient to sustain the conviction[,] . . . [such that] a defendant who introduces evidence after the denial of his motion for a judgment of acquittal made at the close of the government's case thereby waives that motion and cannot make the ruling the subject of appellate review." *Moore*, 927 A.2d at 1049 (internal citations and quotation marks omitted); *see also Wright v. United States*, 513 A.2d 804, 809 (D.C. 1986) (explaining that a defendant "who chooses to present a defense, usually must, if convicted, have his or her own

evidence factored into the sufficiency analysis on appeal . . . for two, related reasons: (1) because all evidence is germane to the truth, and (2) because the defendant is deemed to have subscribed to that truth-seeking premise by electing to put on evidence rather than to rely solely on contesting the government's evidence").[9]  The so-called waiver rule applies "even if it is the defendant who has supplied the *only* proof of an essential element of the charge against him."  *United States v. Ortiz-Rengifo*, 832 F.2d 722, 725 (2d Cir. 1987) (emphasis added).

Appellant argues that we should create an exception to the waiver rule for situations such as his, where (1) he testified only to present his self-defense defense to other charges (the ADW and PFCV counts), and (2) the government's failure of proof in its case in chief was "flagrant."  Appellant argues that he was given a "Hobson's choice to affirmatively defend against the six more serious charges," knowing that the prosecutor's opportunity to cross-examine him would allow the government to fill in the gaps in its CPWL, UF, and UA cases through his testimony.

---

[9] *But see also* the suggestion in *Wright* that "waiver" is not really the best term for this principle.  513 A.2d at 809.

As we have previously explained, we apply the waiver rule so that courts do not have to "blind themselves to incriminating evidence introduced by the defendant who chooses to respond, rather than to demur, to the government's case." *Moore*, 927 A.2d at 1049 & n.5 (quoting *Wright*, 513 A.2d at 809). We are unpersuaded by appellant's argument that we should create an exception to the waiver rule in this case. The logic underlying appellant's argument applies just as well to most other cases in which this court has applied the waiver rule, in which the defendant, following the denial of an MJOA, faces the difficult choice of whether to put on evidence and risk filling in the prosecution's gaps or to forgo the opportunity to put on any defense at all and risk conviction on some or all charges. Appellant attempts to carve out a distinction based on the fact that his reason for testifying was to present a defense on charges other than those for which the government failed to produce evidence. But the record reflects that, in his direct testimony, he did more than present his self-defense defense as to counts one through six. He also used his direct testimony to lay the groundwork for his LEOSA defense to counts eight, nine, and ten, testifying that he had consumed only "two sips" of an alcoholic drink before going to the Minnesota Avenue location on the evening in question and that he had his police badge with him at the time of the incident. Thus, this case is not meaningfully different from other cases

in which we have applied the waiver rule.[10]  Moreover, we align ourselves with courts that have resisted the urged "abolition" of the waiver rule on the ground that it "rests . . . on a perception of the criminal trial as a sporting event in which the rules of the game trump the search for truth." *State v. Perkins*, 856 A.2d 917, 937 (Conn. 2004).  Accordingly, we deem appellant's claim based on his MJOA made at the close of the government's case to be waived, and, in evaluating appellant's insufficiency claim, we will look at all the evidence presented at trial, including during the defense case.

As appellant notes, there is no dispute "that the government's case in chief offered no official records or other specific evidence that [appellant] lacked a license to carry his service revolver in the District or that his service revolver was

---

[10] We acknowledge our court's observation in *Franey v. United States*, 382 A.2d 1019 (D.C. 1978), that early cases establishing or applying the waiver rule were cases in which "the prosecution had in fact established *by its own evidence* a prima facie case." *Id.* at 1021 n.3 (emphasis added) (citing *Thompson v. United States*, 405 F.2d 1106, 1108 (D.C. Cir. 1968)).  The statement in *Franey* may suggest that there is an exception to the waiver rule when the government has not established by its own evidence a prima facie case of the defendant's guilt.  But given *Franey*'s citation to *Thompson*, we think the better reading of the statement in *Franey* is that a jury's lack of credence in a testifying defendant's self-exculpatory testimony cannot fill a gap in the government's inculpatory evidence or render it sufficient.  Neither *Franey* nor *Thompson* involved the situation presented here: one where the defendant's testimony on cross-examination, viewed in the light most favorable to the government, was inculpatory and established the previously unproven elements of the charged offenses.

not registered in the District."[11] The question that remains is whether the CPWL, UF, and UA convictions can stand solely on the basis of appellant's testimony during cross-examination. We review challenges to the sufficiency of the evidence presented at trial by considering the evidence in the light most favorable to the government and determining whether it was sufficient to permit a reasonable factfinder to find guilt beyond a reasonable doubt. *Dyson v. United States*, 450 A.2d 432, 436 (D.C. 1982).

The "light most favorable to the government" standard has particular pertinence in this case because appellant's cross-examination testimony on the District licensure and registration issues was neither straightforward nor

---

[11] In arguing that the evidence presented during the government's case in chief was also insufficient to support an inference that appellant lacked a license to carry his weapon in the District, appellant derides the trial court's statement that "a reasonable person could infer [from the evidence that appellant was] a police officer, [that appellant] didn't have a license for that gun in D.C." Appellant argues that "[t]here was no basis for the trial court to assume, as a matter of law, that law enforcement officials are more likely to be violating firearms law than are ordinary civilians" and that any such assumption contravenes the presumption of innocence. We agree that those assumptions are unwarranted, but we think the criticism of the court's reasoning is unfair; the fact that LEOSA permits an off-duty Prince George's County police officer to carry a concealed weapon in the District of Columbia does provide some reason to think that such an officer would perceive no need to register his service firearm in the District or to obtain a license to carry it here, particularly given the fact (acknowledged by appellant in his testimony and noted in the government's post-trial brief) that out-of-uniform Prince George's County police officers generally are required under their General Orders to keep their firearms "concealed at all times from public view."

unambiguous. Appellant's "No" answer to the question, "you don't have a license to carry a weapon in D.C.; right?" could be read as denoting that it was *not* right to say that he lacked a license. Further, appellant's seemingly evasive response to the question about whether his firearm was registered in the District ("A. It's Prince Georges County, my service weapon.") was similarly ambiguous. But given both our "light most favorable" standard and appellant's acknowledgment in his briefing that "the government was able to elicit, during cross-examination, that [appellant] had no District license or registration for his service pistol," we are obliged to conclude that the evidence was sufficient to support the CPWL, UF, and UA convictions.[12]

### B.

Appellant argues next that his convictions, announced during the proceedings on February 27, 2020, violated the Due Process and Double Jeopardy Clauses because the court had earlier, i.e., on November 27, 2019, "acquitted" him of counts eight, nine, and ten. Specifically, appellant asserts that the court "announced verdicts of 'not guilty'" when it stated after the conclusion of trial on

---

[12] The UA conviction was supported by proof that the firearm was unregistered. *See* D.C. Code § 7-2506.01(a)(3).

November 27 that it did not "think there [was] enough in the record for [it] to make a ruling on" count eight (CPWL) and that it was "going to dismiss or find [appellant] not guilty on counts nine and ten, the UF and UA [charges]," because "there [did not] appear to be any evidence in the record on those two charges. [The court] didn't see any." Appellant relies on *United States v. Martin Linen Supply Co.*, 430 U.S. 564 (1977), in which the Supreme Court instructed that the Double Jeopardy Clause applies if "the ruling of the judge, whatever its label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." *Id.* at 571; *see also id.* at 572 (agreeing with the court of appeals that double jeopardy protection was triggered where it was "plain that the District Court in this case evaluated the [g]overnment's evidence and determined that it was legally insufficient to sustain a conviction"). Appellant argues that here, where the parties had rested and delivered their closing arguments and "the factfinder needed more evidence to reach a verdict, . . . the only lawful verdict was not guilty."

The government contends that "[a]t most," on November 27, 2019, the trial court "issued non[-]final, tentative rulings on [the CPWL, UF, and UA] charges, which did not trigger any double-jeopardy protection." It emphasizes that the trial court expressly declined to rule on CPWL until after the parties had briefed the

LEOSA issue and that the court clarified before the end of the colloquy that it was holding the UF and UA counts in abeyance until after the briefing as well.

Once again, our resolution involves the issue of waiver. As we have previously observed, "the constitutional protection against double jeopardy is a personal privilege, which is waived if no timely objection is made." *In re J.A.H.*, 315 A.2d 825, 827 (D.C. 1974). "[A] waiver by defendant of this constitutional privilege may be either express or implied," such as where a defendant participates in proceedings without raising the defense. *Id.* (quoting *United States v. Reeves*, 293 F.Supp. 213, 214 (D.D.C. 1968)). Here, because appellant did not object to the trial court's decision to hold counts eight, nine, and ten in abeyance after making statements that reflected the court's inclination to dismiss those counts, our scope of review on this issue is limited to review for plain error.[13] *Id.*

We find no plain error. Appellant has pointed us to no case law that suggests that the Double Jeopardy Clause is triggered by a trial judge's post-bench-trial remarks that indicate a plan to dismiss or acquit on certain charges but that are

---

[13] Under the plain-error standard, an appellant is "not entitled to relief [on his double jeopardy claim] unless the error was plain, affects his substantial rights, and seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Haye v. United States*, 67 A.3d 1025, 1030 (D.C. 2013) (alteration in original) (internal quotation marks omitted).

immediately followed, within the same colloquy, by a decision to hold the charges in abeyance pending further briefing. And, quite to the contrary, we have explained that because "a trial or a fact-finding hearing does not terminate until the actual entry of judgment," "until then, the [trial] court is free to reconsider its prior rulings."[14] *Id.* Here, because the trial court did not enter a judgment of acquittal

---

[14] Our statement was consistent with the holdings of other courts, including the Supreme Court. *See, e.g.*, *Price v. Vincent*, 538 U.S. 634, 642-43 (2003) (holding, in a habeas case, that the Michigan Supreme Court did not apply the law on double jeopardy in an objectively unreasonable manner; the Michigan court had reasoned that the trial judge's comment, made when ruling on a directed verdict motion in a first-degree murder case, that premeditation had not been shown, was "not sufficiently final as to terminate jeopardy" where "no formal judgment or order [was] entered on the record," such that when the court subsequently said that it would reserve its ruling and thereafter permitted the first-degree murder charge to be submitted to the jury, there was no double jeopardy violation); *United States v. Hill*, 643 F.3d 807, 867 (11th Cir. 2011) ("[A] judgment of acquittal is not final as soon as it is spoken or written."); *United States v. Baggett*, 251 F.3d 1087, 1095 (6th Cir. 2001) ("[A]n oral grant of a Rule 29 motion outside of the jury's presence does not terminate jeopardy, inasmuch as a court is free to change its mind prior to the entry of judgment."); *United States v. Byrne*, 203 F.3d 671, 675 (9th Cir. 2000) (holding that there was no double jeopardy violation where the defense moved for a judgment of acquittal and the district court initially granted it but subsequently denied it after reviewing the government's motion for reconsideration and accompanying testimony transcript; reasoning that it was "clear . . . that the district court's initial ruling on the defendant's motion for acquittal was not final," as the district judge made clear "in the course of the same colloquy in which she announced the decision"); *United States v. LoRusso*, 695 F.2d 45, 54 (2d Cir. 1982) (holding that there was no double jeopardy issue where the trial court orally granted the defense's MJOA on Count 2 for lack of proof of intent to distribute but modified its ruling the next day to allow the prosecution to proceed on a lesser-included offense, thus reducing the charge rather than dismissing it); *State v. Sperry*, 945 P.2d 546, 550 (Or. 1997) (holding that there was no double jeopardy

(continued…)

on any of the counts in issue on November 27, 2019; reached no resolution during the further proceedings on December 16, 2019; and delayed its final ruling until February 27, 2020, it was free to reconsider its initial remarks about the sufficiency of the evidence.[15]

Further, given that appellant does not dispute that he had no District of Columbia license or registration for his weapon, we can say with assurance that this is not a case that implicates the concern that the Double Jeopardy Clause was designed to protect against: the government's subjecting a defendant to a successive trial so as to "enhance[e] the possibility that even though innocent he may be found guilty." *Martin Linen Supply Co.*, 430 U.S. at 569. This is, however, a case in which we recognize, as the Supreme Court did, the value of "afford[ing] a trial judge the maximum opportunity to consider with care a pending acquittal motion." *Id.* at 574. That opportunity is what the trial court took in

---

(…continued)
violation where the trial court initially said that it would grant the defense's MJOA on one of the counts but reversed its decision the next day).

[15] This case is starkly different from *Martin Linen Supply Co.*, where double jeopardy protection was triggered because the district court had entered a judgment of acquittal after discharging a deadlocked jury. *See* 430 U.S. at 566.

delaying its final ruling, and we conclude that its eventual guilty verdicts on counts eight, nine, and ten did not violate the guarantee against double jeopardy.[16]

## C.

Appellant's remaining argument is that his convictions on counts eight, nine, and ten were preempted by LEOSA. He argues first that the trial court erred in finding that he was not protected by LEOSA because his weapon was "not conceal[ed]."[17] Noting that LEOSA does not define "concealed firearm," appellant urges us to recognize a broad definition under which a firearm may be concealed

---

[16] Appellant does not elaborate on his argument that the trial court violated his due process rights, other than by stating that the Due Process Clause requires the government to prove his guilt beyond a reasonable doubt. Because we find no error in the trial court's decision to hold counts eight, nine, and ten open until its final decision on February 27, 2020, and because we have concluded that there was sufficient evidence to support his convictions beyond a reasonable doubt when viewing the evidence from the entire trial, we conclude that there was no Due Process Clause violation.

[17] Appellant argues that the trial judge erred in finding that appellant's weapon was not concealed within the meaning of LEOSA both when the weapon was holstered and when appellant pulled it out. However, the trial transcript makes clear that the court did not base its decision that appellant's conduct was not covered by LEOSA on appellant's having pulled out his gun to defend himself; indeed, as recounted above, the court stated that, had that been the only moment appellant's weapon was not concealed, the court's decision as to the applicability of LEOSA would have been different. The court's decision was based on appellant's having pulled his jacket back to show that he was carrying a gun and his having "sort of flashed the gun."

even if it is partially visible.[18]  He also argues that the rule of lenity forecloses an interpretation that "concealment means invisibility."  Appellant contends in the alternative that LEOSA's protection of law enforcement officers from prosecution applies to both open carry and concealed carry of firearms; specifically, he argues that "Congress used 'carry a concealed firearm' [in LEOSA to] protect officers even if their service revolvers were concealed – not only if their service revolvers were concealed."  Appellant urges in addition that while the trial court did not appear to rely on appellant's alcohol consumption as a basis for denying him coverage under LEOSA, that basis would have been unfounded.  He points out that the court never made a finding that he was "under the influence" within the meaning of LEOSA — only that he probably had more than just "two sips" of an alcoholic drink — and that the court had an insufficient basis for an "under the

---

[18] Appellant cites inter alia the definition applied by an Ohio appellate court in interpreting that jurisdiction's concealed carry statute, under which the weapon need not be "totally hidden from observation in order to render it concealed," *State v. Brandle*, 689 N.E.2d 94, 97 (Ohio Ct. App. 1996), and an Arizona case stating that "one can carry a concealed weapon on one's person in a holster, scabbard, or case that is visible," *State v. Moerman*, 895 P.2d 1018, 1023 (Ariz. Ct. App. 1994). Appellant also invites our attention to training materials that suggest that a gun holstered inside a front waistband with its handle visible is one method of concealed carry, and to a police-training website that advises, "To be considered for concealed carry, a holster must completely cover the trigger while still allowing for a full firing grip on the draw."  Warren Wilson, *What Your Department's Off Duty/Concealed Carry Training Program Should Include*, POLICE 1 BY LEXIPOL (Nov. 27, 2019), tinyurl.com/3nmvvqdd; https://perma.cc/PS2H-4KKU .

influence" finding since the police officers who responded to the scene did not conduct any sort of sobriety test.

In the absence of a LEOSA definition of "concealed firearm," the government urges us to rely on the dictionary definition of "concealed": "kept out of sight or hidden from view." *Concealed*, MERRIAM-WEBSTER'S ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/concealed; https://perma.cc/6CVY-DM75 (last visited June 14, 2022). The government cites *Hood v. United States*, 28 A.3d 553, 559 (D.C. 2011) (noting that we may look to the dictionary for the meaning of a term in ordinary and common speech), and *Shepard v. Madigan*, 734 F.3d 748, 750 (7th Cir. 2013) (stating, with reference to an Illinois concealed carry law, that "the gun must not be visible to other persons"). The government also cites the testimony by police officers that appellant appeared inebriated and argues that appellant failed to establish that he was not under the influence of alcohol, as it contends he was required to do to bring himself within the protection of LEOSA as an affirmative defense.

Neither the LEOSA statutory language nor the Committee Reports accompanying the legislation contain any statements broaching a federal definition

of "concealed firearm."[19] We adhere to the maxim of statutory construction that in the absence of a statutory definition, "words of [a] statute should be construed according to their ordinary sense and with the meaning commonly attributed to them." *Davis v. United States*, 397 A.2d 951, 956 (D.C. 1979) (citing *United States v. Thompson*, 347 A.2d 581, 583 (D.C. 1975)). Case law and secondary authorities reveal that there is a common meaning to the term "concealed firearm" or "concealed weapon." *See, e.g.*, *Shipley v. State*, 220 A.2d 585, 588-89 (Md. 1966) ("[A] weapon is concealed if it is so situated as not to be discernible by ordinary observation by those near enough to see it if it were not concealed who would come into contact with the possessor in the usual associations of life . . . .") (citing 94 C.J.S. *Weapons* § 8; 56 Am. Jur. 2d *Weapons and Firearms* § 10, pp. 997-98; W. M. Moldoff, Annotation, *Concealed Weapon*, 43 A.L.R. 2d 492, 510-15 (1955)). The cases cited in note 18 *supra* demonstrate that there is not a uniform definition of the term "concealed,"[20] but that does not militate against

---

[19] *See* H.R. REP. NO. 108-560 (2004); S. REP. NO. 108-29 (2003).

[20] We note that even some of the definitions that appellant cites support the ordinary meaning of the term "concealed" that we adopt. For example, in *State v. Brandle*, the court endorsed a definition requiring, for a conviction of carrying a concealed weapon, "that ordinary observation would give no notice of [the weapon's] presence." 689 N.E.2d at 97 (quoting *State v. Coker*, 472 N.E.2d 747, 749 (Ohio Ct. App. 1984)). Under that definition, appellant's firearm was not concealed.

construing the term as used in LEOSA to have its ordinary meaning in common usage.[21] We also note that interpreting "concealed" to mean "not . . . discernible by ordinary observation" squares with the definition of "concealed" contained in the District of Columbia's firearm regulations. *See* 24 D.C.M.R. § § 2344.1 (2022) (providing that "[a] licensee shall carry any pistol in a manner that it is entirely hidden from view of the public when carried on or about a person . . . .").[22]

"When a defendant relies on a statutory exception [such as the LEOSA exception] as an affirmative defense to a criminal charge, the burden is on the defendant to bring himself or herself within the exception." *Bsharah v. United States*, 646 A.2d 993, 998 (D.C. 1994). Reviewing de novo whether appellant was

---

[21] And because we have this interpretive tool, we need not resort to the rule of lenity, which applies only if, after applying ordinary tools of statutory interpretation, "there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (internal citations and quotation marks omitted). We also need not address whether the rule of lenity applies in interpreting the terms of a statutory affirmative defense. *See, e.g.*, *United States v. Christie*, 825 F.3d 1048, 1065 (9th Cir. 2016) (expressing doubt that the rule of lenity should apply to "'ambiguous' affirmative defenses rather than to ambiguous laws that define elements or mandate punishment").

[22] Section 2344.1 implements D.C. Code § 22-4504(a) (2022 Supp.) ("No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law . . . .") and D.C. Code § 22-4506(a) (2022 Supp.) (authorizing the Chief of the Metropolitan Police Department to "issue a license to [a] person to carry a pistol concealed upon his or her person").

entitled to the LEOSA exception, *see Thorne v. United States*, 55 A.3d 873, 881 (D.C. 2012), we have no difficulty concluding that appellant failed to establish that his weapon was concealed, i.e., "not . . . discernible by ordinary observation"[23] or "hidden from view of the public,"[24] during the period before he unholstered his gun and pointed it in self-defense.[25]

Appellant's briefs repeatedly assert that the gun handle was only "briefly visible" and refer to appellant's "fleeting open carry." But the security video shows that more than a minute passed between the time when appellant arrived at

---

[23] *Shipley*, 220 A.2d at 588.

[24] 24 D.C.M.R. § 2344.1.

[25] Appellant suggested during oral argument that Congress, in enacting LEOSA, would have intended not a common, dictionary-based definition of "concealed" but a law-enforcement-specific meaning. However, appellant has not shown that there is any accepted specialized law-enforcement-specific meaning or that the manner in which he carried his firearm on the night in question fell within such a specialized meaning. Moreover, in enacting LEOSA, Congress made repeated references to State laws that contain references to concealed firearms. The LEOSA legislative history explains that Congress intended to "preempt" State laws that "prohibit[ed] out-of-State, off-duty law enforcement officers from carrying concealed weapons, H.R. Rep. No. 108-560 at 11, 12, and both the statutory language and the Committee Reports confirm that Congress did not intend to supersede State laws that permit private persons to restrict the possession of concealed firearms on their property. *See* 18 U.S.C. § 926B(b)(1); H.R. REP. NO. 108-560, at 82. These references weigh against appellant's suggestion that Congress intended a specialized, law-enforcement-community definition of "concealed firearm."

the apartment building, with the handle of his holstered weapon resting outside of and on top of the right side of his jacket, and the moment when he pointed the weapon at Briggs.  Appellant also refers to the exposure of his gun as "unintentional" and implies that the "slim fitting" sports jacket he was wearing made it difficult to conceal the gun.  But, notably, the video shows that after appellant reholstered his gun after pulling it out during the encounter with Briggs, he quite easily pulled his jacket over the weapon and holster and buttoned the jacket, thereby concealing the weapon and showing that it had been possible all along for him to conceal it under his buttoned jacket.  From our review of the video, we also are satisfied that the trial court did not clearly err in finding that "there were several occasions that evening where [appellant] sort of flashed the gun" (by, it appears to us, arching his back in a way that caused the weapon to be more prominently displayed) and that appellant "almost pull[ed] his jacket back to show . . . that he was carrying a gun."

We find it unnecessary in this case to delineate the exact scope of "concealed" within the meaning of LEOSA (e.g., whether a firearm covered by a jacket was concealed if the jacket flap was lifted for a second or two, such that the gun was visible).  It was enough to render appellant's service weapon not "concealed" that the firearm was visible on appellant's hip from the outset of the

minutes-long encounter (even though appellant's jacket was large enough to cover the weapon) and that, as the trial court found, appellant flashed the weapon to display it to the group.[26]

Appellant argues, however, that "[a] defendant does not forfeit the LEOSA defense even if his service revolver is unconcealed." He contends that "Congress wanted to protect concealed carry in addition to, not in place of, open carry," and that LEOSA used the term "concealed" "to expand the scope of the defense, not to restrict it." He further asserts that "it is inconceivable that Congress would have given police officers broader protection for concealed carry than for open carry." These arguments are unpersuasive. We see no indication in the text of LEOSA or its legislative history that Congress meant to effect a sweeping override of State gun-safety laws by mandating that open carry is permissible for out-of-State, off-duty law enforcement officers even in jurisdictions where open carry is prohibited. It may be that, as appellant highlights, "only five other states join the District in barring the open carry of handguns," but for those jurisdictions, the interpretation appellant urges — that LEOSA authorizes open carry as well as concealed carry —

---

[26] Because we conclude that the trial court properly determined that appellant was not covered by LEOSA because his weapon was not concealed, we need not address whether the LEOSA exception was unavailable to appellant for other reasons, such as his allegedly being under the influence of alcohol.

would have been a significant intrusion on their ability to regulate to deter gun violence.[27] We are confident, especially in light of what the legislative history shows was the vigorous debate that attended Congress's efforts to permit concealed carry by out-of-State and retired law enforcement officers, that Congress would not have imposed open carry through indirection — i.e., that if this had been Congress's intent, it would not have done so by "hid[ing an] elephant[] in [a] mousehole," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), by using the term "may carry a concealed firearm" to mean "may carry a firearm openly or concealed."[28]

---

[27] We note that the Supreme Court's recent opinion in *New York State Rifle & Pistol Assoc. v. Bruen*, No. 20-843, ___ U.S. ____, 2022 U.S. LEXIS 3055 (June 23, 2022), suggests that a State would be required to allow open-carry of a handgun for self-defense if it were to broadly prohibit concealed carry. *See id.* at *66-67 (describing a historical consensus "that concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry") and at *74-75 (observing that historically, "States could lawfully eliminate one kind of public carry—concealed carry—so long as they left open the option to carry openly"). But nothing in the opinion implies that a State must allow open carry. We also note that the Court's decision in *Bruen* "does not prohibit States from imposing licensing requirements" for concealed-carry of a handgun for self-defense. *Id.* at *101 (Kavanaugh, J., concurring).

[28] Moreover, "[t]his elephant-in-mousehole construction . . . would not foster a 'symmetrical and coherent regulatory scheme.'" *Grand Trunk W. R.R. Co. v. U.S. Dep't of Labor*, 875 F.3d 821, 828-29 (6th Cir. 2017) (internal citation omitted) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995)). The LEOSA reference to "concealed firearm," 18 U.S.C. § 926B(a), is in stark contrast to the terminology used elsewhere in the "Firearms" chapter of Title 18 of the United States Code (Title 18, Chapter 44), of which LEOSA is a part. For example, 18

(continued…)

Appellant is correct in noting that the Supreme Court has sometimes interpreted statutory language to mean the seeming opposite of its plain meaning, but it has done so when this appears necessary to effectuate the statutory purposes. *See, e.g.*, *King v. Burwell*, 576 U.S. 473, 492, 497-98 (2015) (interpreting the phrase "Exchange established by the State" to mean "Exchange established by the State or the Federal Government," because exclusion of federal exchanges from key Affordable Care Act provisions would be "untenable in light of the statute as a whole" and lead to a "calamitous result that Congress plainly meant to avoid"). Not so here. We need not interpret "may carry a concealed firearm" to mean "may openly carry a firearm" in order to effectuate the legislative purpose: "to protect officers and their families from vindictive criminals, and to allow thousands of equipped, trained and certified law enforcement officers, whether on-duty, off-duty or retired, to carry concealed firearms in situations where they can respond immediately to a crime across state and other jurisdictional lines." S. REP. NO. 108-29, at 4.

---

(…continued)
U.S.C. § 926A refers to the interstate transportation of a "firearm" "from any place where [one] may lawfully possess and carry such firearm to any other place where [one] may lawfully possess and carry such firearm," suggesting that LEOSA's reference to a "concealed firearm" is not synonymous with the bare term "firearm."

## III.

For the foregoing reasons, appellant's convictions are

*Affirmed.*